## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re Application of<br><br>HCS Beteiligungsgesellschaft mbH,<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding | Case No. 22- |

## DECLARATION OF DR. OLAF GIERKE IN SUPPORT OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, Dr. Olaf Gierke, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a partner at the law firm of Broich Partnerschaft von Rechtsanwalten mbB ("**Broich**") in Frankfurt am Main, Germany.  I am licensed to practice law in Germany.  Broich is counsel for HCS Beteiligungsgesellschaft mbH ("**HCS**" or "**Petitioner**") in connection with the dispute discussed below, including anticipated litigation.

2.      I submit this declaration in support of the Petitioner's application seeking an order pursuant to 28 U.S.C. § 1782 to obtain limited discovery in the United States from Ruben King-Shaw ("**Respondent**").

### A.      The Parties and the Present Dispute

3.      The following is a summary of the allegations that HCS intends to make in connection with forthcoming German lawsuits.

4.      HCS is a venture capital firm focusing primarily on investments in technology companies in Europe and Middle East.  HCS is organized as a limited liability company incorporated under the laws of Germany with its business seat in Frankfurt am Main.

5.      From 2016 on, HCS invested in Innoplexus AG ("**Innoplexus**"), a German pharmaceutical technology company that uses artificial intelligence and blockchain technology to facilitate the drug development process.  Innoplexus was founded by Dr. Gunjan Bhardwaj in 2016, who has, since then and until very recently, been its Chief Executive Officer.  Both HCS and Dr. Bhardwaj (as well as Innoplexus) signed a Shareholders' Agreement Relating to Innoplexus ("**Shareholders' Agreement**").  Among other things, the Shareholders' Agreement states in Section 20.1 that Dr. Bhardwaj would devote his entire work time and attention to Innoplexus and would not engage in activities that would impair that obligation.  In addition, Section 20.2 includes a non-competition provision for, *inter alia*, Dr. Gunjan Bhardwaj and shareholders holding not less than 10% of shares in Innoplexus.  Furthermore, under Section 20.7, *inter alia*, Partex and Dr. Gunjan Bhardwaj are obliged to neither directly nor indirectly cause, solicit, induce, persuade or entice, *inter alia*, any member of the management or employee of Innoplexus to terminate or discontinue their service or employment with Innoplexus or any of its affiliates.

6.      In 2017, Dr. Bhardwaj formed the legal predecessor of today's Partex NV ("**Partex**") as his personal holding company for the sole purpose of holding Dr. Bhardwaj's shares in Innoplexus.  At the time, Partex held a majority interest in Innoplexus.

7.      As a startup company, Innoplexus needed continuous additional funding.  In 2019 it started preparing for a Series D financing with a pre-money valuation of Euro 175 million, approx. USD 176 million.  Until then, HCS and other investors had provided more than Euro 30 million in three funding series.  HCS alleges that, starting in December 2020 at the latest, Dr. Bhardwaj began planning to exploit Innoplexus' assets and intellectual property for the benefit of Partex, and by extension, to himself personally.

2

8.      As part of those efforts, while purporting to be soliciting new investment in Innoplexus, Dr. Bhardwaj co-opted new investors to instead provide capital to Partex.  HCS alleges, that in at least one case, he solicited an investment in Partex by an investor who expressly wanted to invest in Innoplexus directly, however, Partex provided him with a sub-participation in Innoplexus at much worse conditions than in case of a direct participation of such investor in Innoplexus' Series D round and Partex used the difference for its own benefit.

9.      In January 2021, a former member of Innoplexus' supervisory board made Dr. Bhardwaj aware of a contact, Francisco Fernandez, a Swiss investor, who was interested in investing in Innoplexus.  The former supervisory board member arranged a meeting between himself, Mr. Fernandez, and Dr. Bhardwaj for purposes of soliciting Mr. Fernandez's investment in Innoplexus.

10.     Prior to the meeting, the former supervisory board member sent the investor a presentation on Innoplexus aimed at soliciting his investment in Innoplexus.

11.     The meeting occurred on January 27, 2021 by video conference.  During the meeting, the parties discussed an investment opportunity in Innoplexus, and Mr. Fernandez showed a strong interest in participating in funding a Series D financing round for Innoplexus.

12.     The next day, on January 28, 2021, Dr. Bhardwaj emailed Mr. Fernandez, but instead of soliciting investment in Innoplexus, Dr. Bhardwaj solicited investment for Partex, his personal holding company.  Specifically, Dr. Bhardwaj emailed Mr. Fernandez saying, "It would be a **real pleasure if you participate in Partex**." (Emphasis in original.)

13.     Dr. Bhardwaj also stated:

> We have a **short term opportunity** to '**buy**' out an Innoplexus shareholder in **addition** at a discount for 15-20 M EUR (having **26%** currently).  This can get **Partex control** in Innoplexus (base technology) to **over 60%**. (Emphasis in original.)

14.     Dr. Bhardwaj attached an investment pitch presentation for Partex to the email sent to Mr. Fernandez.  In it, Dr. Bhardwaj lays out his plan on how to exploit Innoplexus' assets and technology using Partex subsidiaries that were not in existence at this point in time.  Dr. Bhardwaj had apparently secured the support of Respondent, who became member of the supervisory board in March 2021, as he is presented as team member in the presentation.

15.     Dr. Bhardwaj excluded the former Innoplexus supervisory board member from these discussions.

16.     In February 2021, Mr. Fernandez decided to invest more than Euro 40 million into Partex, even though Partex's only significant asset was its shareholding in Innoplexus.

17.     With that influx of capital, Partex increased its shareholding in Innoplexus through a forced capital increase to the exclusion of other shareholders, including HCS.  This transaction and a subsequent acquisition of additional shares from a larger shareholder had the effect of increasing Partex's shareholding in Innoplexus to 73.27%, making Partex the majority owner of Innoplexus.

18.     The Partex website indicates that Mr. Fernandez is nowadays the "Chairman & Co-Founder" of Partex.  The only other member of the board is Dr. Bhardwaj, who the Partex website describes as its "CEO & Co-Founder."

19.     Today, rather than acting as a separate business, Innoplexus is effectively a service-provider to Partex.  For example, on Innoplexus' LinkedIn page, it recently posted: "Innoplexus is very proud to be part of Partex NV, the World's first Data to Drug, Digital Pharma Platform." Similarly, the Partex website describes Innoplexus as one of its "platform businesses" and part of the "Partex Group of Companies."

4

20.     After gaining control of Innoplexus, Partex began to form and acquire various subsidiaries that now engage in business areas in which Innoplexus was active before the Partex takeover.  For example, in Q2 2021, the Partex's subsidiaries CureTeq AG and Perpetual Block AG were established, the entities which were referenced in the investment pitch presentation for Partex.

21.     Partex also poached key employees from Innoplexus to work for, and for the benefit of, Partex.

22.     Through this takeover, Dr. Bhardwaj, Partex, and Mr. Fernandez have dramatically decreased the value of HCS's holding in Innoplexus.

23.     A recent article in the Swiss business magazine Bilanz profiled Mr. Fernandez.  The article is entitled (in English), "Unicorn Catcher: Francisco Fernandez.  After selling his company Avaloq, the entrepreneur already has two new billion-dollar companies at the start."  A true and correct copy of the original article, in German, along with an unofficial translation, is attached hereto as **Exhibit 1**.  The article, published on October 1, 2022, describes Mr. Fernandez's investment in Partex, saying Mr. Fernandez acquired "another promising start-up" and describes Innoplexus as Partex's subsidiary.  "Innoplexus," the article says, was "founded by Indian management consultant Gunjan Bhardwaj, a good friend of Fernandez."  The article goes on to say:

> "'Innoplexus probably has the largest oncology database in the world,' says Fernandez.  The company has already registered patents and signed royalty deals.  Around a dozen of the approximately 350 employees are based in Zug.  At 30 million, sales are still on the low side, but 'the potential is many billions,' says Fernandez:  The company valuation is already close to that of a unicorn.  The exit is planned for 2025.  For the time being, the priority is to develop further drug assets and conclude additional royalty deals.  Another Partex subsidiary called Cureteq is developing its own clinical studies on the same basis."

24.     HCS is still a minority shareholder in Innoplexus but has no stake in Partex.

25.     Respondent became a member of the Innoplexus supervisory board on March 8, 2021.  He ceased to be a member of the supervisory board on February 25, 2022 and was subsequently re-elected to the supervisory board on April 19, 2022.  Since then, Respondent has been a member of the Innoplexus supervisory board and is now the chairman of the supervisory board.  A true and correct copy of the list of supervisory board members submitted to the Commercial Register of the Regional Court of Frankfurt am Main is attached hereto as **Exhibit 2**.

**B.     Communications Between Petitioner and Dr. Bhardwaj**

26.     On January 10, 2022, HCS hired the law firm Broich Partnerschaft von Rechtsanwälten mbB to represent it in connection with this dispute, including to initiate litigation in Germany.

27.     On September 9, 2022, HCS wrote a letter to Dr. Gunjan Bhardwaj.  A true and correct copy of that letter, along with an unofficial translation, is attached hereto as **Exhibit 3**.  The letter asked Dr. Bhardwaj to issue a declaration "stating that you will comply with [his obligations under the Shareholders' Agreement] in the future and, in particular, that you will not engage in any other activities that violate your obligation to devote your entire work time and attention to Innoplexus AG or that could impair it even slightly."  The letter also requested Dr. Bhardwaj to disclose to HCS "all activities, including the respective periods of time spent on them, which you have performed since signing the Shareholders' Agreement that violate your obligation" to devote all of his time to Innoplexus.

28.     On September 14, 2022, Broich received an email from Dr. Carsten van de Sande, an attorney at the German law firm of Hengeler Mueller.  A true and correct copy of that email, along with an unofficial translation, is attached hereto as **Exhibit 4**.  The email stated that Hengeler Mueller represents Dr. Bhardwaj "in his capacity as a party to the 'Shareholders' Agreement

relating to Innoplexus AG' dated March 8, 2021, and any other agreements between the shareholders of Innoplexus AG."

29.     To date, HCS has not received a satisfying response to the September 9, 2022 letter.

**C.      HCS's Contemplated Proceeding On Behalf of Innoplexus**

30.     The discovery sought by Petitioner is for use in a lawsuit that HCS will imminently file against Partex and Dr. Bhardwaj in connection with the damages caused through the asset stripping.

31.     HCS is currently preparing a lawsuit to assert damage claims in its own name and on behalf of Innoplexus under Sec. 311, 317, 309(4) of the German Stock Corporation Act and in analogy of Sec. 113(1) of the German Commercial Code, respectively Sec. 148, 93, 117 of the German Stock Corporation Act, that will be filed in front of the Regional Court of Frankfurt am Main, Germany ("**Innoplexus Proceeding**") in the course of January 2023.  In the Innoplexus Proceeding, HCS will claim damages on behalf of Innoplexus against Partex and Dr. Gunjan Bhardwaj for causing Innoplexus to enter into disadvantageous transactions and taking disadvantageous measures to the benefit of Partex without granting adequate compensation after Partex became Innoplexus' controlling entity.

32.     HCS petitioned for the convocation of an extraordinary shareholders' meeting with an agenda point to appoint a special representative to assert these claims under Sec. 311, 317 of the German Stock Corporation Act, Sec. 93, 117 of the German Stock Corporation Act and in analogy of Sec. 113(1) of the German Commercial Code against Dr. Gunjan Bhardwaj and Partex NV on behalf of Innoplexus and, due to the lack of response of Innoplexus, initiated a court proceeding requesting an authorization to convene such general meeting with the aforementioned resolution at the competent court, the District Court of Frankfurt am Main.  A true and correct copy of the petition and the request for authorization that states the facts on which the claims are

based, in original German and unofficial English translation, is attached hereto as **Exhibit 5**. As such proceeding usually takes time, HCS decided to file the claims now on its own.

**D.    HCS's Contemplated Proceeding Against Partex and Dr. Bhardwaj**

33.    The discovery sought by Petitioner is for use in a lawsuit that HCS will imminently file against Partex and Dr. Bhardwaj as part of its ongoing dispute with Innoplexus (the "Partex Proceeding," and together with the Innoplexus Proceeding, the "German Proceedings"). Petitioner intends to file this lawsuit in the Partex Proceeding in the Regional Court of Frankfurt am Main, Germany, within January 2023.

34.    The Partex Proceeding will seek claims for, among other things, violation of Dr. Gunjan Bhardwaj's obligations under Sec. 20.1 of the Shareholders' Agreement and potentially Partex's breach of Sec. 20.2 and 20.7 of the Shareholders' Agreement.

35.    The evidence sought from Respondent is needed for the adequate and prompt adjudication of the German Proceedings.  As reflected in the Proposed Subpoena, attached as Exhibit 1 to the accompanying declaration of Duane L. Loft, this evidence includes:

(a)    All documents and communication between Respondent, Partex, Dr. Bhardwaj and Mr. Fernandez and any supervisory board members, employees, officers, directors, or agents and advisors of Partex or Innoplexus related to the transfer of assets, business opportunities, and know-how from Innoplexus to Partex and its subsidiaries.

(b)    All documents and communications between Respondent and Dr. Bhardwaj relating to the solicitation of investment from Mr. Fernandez.

(c)    All documents and communications between Respondent and Mr. Fernandez related to the investment in Partex.

(d)    All documents and communications between Respondent and any supervisory board members, employees, officers, directors, or agents and advisors of Partex or Innoplexus related to Partex's takeover of Innoplexus as majority shareholder.

(e)    All documents and communications between Respondent and Dr. Bhardwaj related to HCS's shareholding in Innoplexus, including the circumstances

8

that led to Innoplexus' forced capital increase and the decision to exclude HCS' subscription right.

(f)     All documents and communications between Respondent and Dr. Bhardwaj relating to the circumstances under which Respondent joined the Partex team and was elected to the Innoplexus supervisory board.

36.     These documents will directly facilitate HCS's arguments in the German Proceedings because Respondent has first-hand knowledge of the central issue in those proceedings: the extent to which Dr. Bhardwaj and Partex misappropriated the assets and business opportunities of Innoplexus for their personal benefit and the benefit of Partex. As a member of the "team" involved in the enterprise, Respondent is likely to be in possession, custody, or control of highly relevant evidence. These documents will also directly facilitate HCS's claims on behalf of Innoplexus in the Innoplexus Proceeding.

37.     Petitioner acknowledges that, until the company or an appointed special representative approves the waiver of the confidentiality obligation of Respondent, only the Non-Confidential Discovery is available. I understand that the Application seeks (i) immediate production of the Non-Confidential Discovery and, (ii) the production of all other responsive discovery in the event that the special representative is appointed and approves the waiver of the confidentiality obligation to Respondent. Under these terms, I am aware of no limitation under German law that would prohibit disclosure under Sec. 1782.

**E.     Discovery in the German Proceedings**

38.     German judicial procedures in civil law are mainly governed by the Code of Civil Procedure, or Zivilprozessordnung ("ZPO").

39.     The requested discovery would almost certainly be unavailable to Petitioner in the German Proceedings. Under the Sec. 142 ZPO, a court may direct one of the parties or a third party to produce records or documents, as well as any other material, that are in its possession and

to which one of the parties has referred.  However, the decision to order the production of records or documents is in the discretion of the court.  The requesting party is not entitled to demand the production of documents.

40.     In general, under Sec. 142 ZPO German courts will only request the production of documents that are specifically identified, not categories of documents that are relevant to topics at issue in the litigation.  The requesting party must also justify the request by explaining how each specific document requested will be used to support a claim or defense in the lawsuit.  The requesting party must therefore have specific knowledge of both the document's existence and its content.

41.     Sec. 142 ZPO does not authorize a court to order a party to search for and produce categories of documents relating to certain subject matter.  In fact, parties cannot even request a complete file that is known to exist, as opposed to specific documents.

42.     Furthermore, the jurisdictional reach of German courts is limited with regard to records or documents that are in possession of parties situated outside of Germany.  In particular, German courts seems to be unable to enforce production of documents that are held outside of Germany by foreign citizens or foreign entities that are not parties to the proceedings.

43.     Petitioner therefore will almost certainly be unable to obtain the relevant documents from Respondent given that it is not possible to identify and name certain records or documents and that Respondent resides in the United States.

     **F.     Any Confidentiality Obligations Do Not Bar the Requested Discovery.**

44.     The German Stock Corporation Act provides for a statutory confidentiality obligation for the members of the supervisory board (Sec. 116, 93 of the German Stock Corporation Act).  Under this confidentiality obligation, a member of the supervisory board is

obliged to maintain secrecy about all confidential information or secrets of the company, in particular regarding business and trade secrets (*Betriebs- und Geschäftsgeheimnisse*).

45.     However, the duty of confidentiality only applies to information that the supervisory board member has obtained as a result of his activities as a member of the supervisory board.

46.     Information obtained before the appointment as member of the supervisory board and after resignation from the supervisory board is not subject to the statutory confidentiality obligation.

47.     In addition, information obtained without any connection to the membership in a stock corporation's supervisory board is not subject to the statutory confidentiality obligation set forth in Sec. 116, 93 of the German Stock Corporation Act.  Therefore, the following information is not subject to the confidentiality obligation: (a) documents, communications, and agreements between Respondent and Partex or Dr. Bhardwaj, (b) documents, communications, and agreements related to Respondent's position as member of Partex's team, (c) documents that pre-date Respondent's election to the supervisory board on March 8, 2021, that is, all documents and communications between Respondent and Dr. Bhardwaj leading up to and following the meeting between Dr. Bhardwaj and Mr. Fernandez and Mr. Fernandez's subsequent investment in Partex, and (d) documents and communications between Respondent related to Partex or Innoplexus from the period of February 23, 2022 to April 19, 2022, during which Respondent was not a member of the supervisory board (the "**Non-Confidential Discovery**").  There is no limitation under German law on disclosure of the Non-Confidential Discovery in this proceeding.

48.     Notwithstanding the confidentiality obligation, a company's management can authorize the disclosure of confidential information as it alone is "master of the company's secrets"

11

and can opt for disclosure in individual cases.  If appointed, a special representative would be authorized to the extent of its appointment (i.e., related to Innoplexus' claims against Dr. Bhardwaj and Partex in connection with the fraudulent asset stripping) to decide on a waiver of the confidentiality obligation.  This would allow disclosure of information that is covered by the confidentiality obligation, including documents from Respondent that are responsive to the subpoena and not included in the categories of Non-Confidential Discovery described above.

G.    **German Courts Are Receptive to Section 1782 Evidence**

49.    Evidence collected as a result of HCS's Application will be admissible in the German Proceedings, and German courts routinely allow the admission of evidence obtained pursuant to Sec. 1782.

50.    No provision in the ZPO or other source of German law generally prohibits the use of evidence obtained through foreign discovery procedures.

51.    It is not a problem under German law that a Sec. 1782 Application may lead to the discovery of evidence of a type and scope that is broader than what could be obtained under German law.  The German court retains discretion as to what evidence to allow for use in the German Proceedings.  To my knowledge, there is no German law or legal authority that prohibits the use of Sec. 1782 evidence from being used in German legal proceedings.  To the contrary, in my personal experience, German courts have allowed and relied upon such evidence.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 21, 2022 at Frankfurt am Main, Germany.

_____

DR. OLAF GIERKE

12

# EXHIBIT 1

Machine Translated by Google

# BEGIN



**RESTLESS** After having only a part-time job as a VR at the sold Avaloq, Fernandez puts his time and energy into start-ups.

# unicorn catcher
**Francisco Fernandez** After selling his Avaloq, the entrepreneur already has two new billion-dollar companies at the start.

**Francisco Fernandez** who these days on social media encountered, usually sees him surrounded by expensive – often old – cars. Since selling Avaloq, which he had built up, to the Japanese NEC two years ago for over CHF 2.5 billion sold, the 59-year-old seems to be enjoying life.

Appearances are deceptive. "I'm not the type who is lying around on beaches now," he says himself: "I have to work, then I'm happy." And so has the entrepreneur already again two new unicorns on

Start: In Zug he originally got it from the Swedish serial Entrepre

Utopia Music, a company founded by **Mattias Hjelmstedt** in London. "The music industry is totally fragmented, outdated, not digitized - much worse than the banking industry was 30 years ago," Fernandez observed. Utopia Music develops a software platform for the management of copyrights: «Enter the music industry

There's a lot of money going on because the roy alties aren't being collected efficiently and aren't being paid out efficiently." Utopia has developed technology to analyze radio and TV stations and has entered into collaborations with streaming services: "We know who is playing what, when and where." Utopia has 600 employees, 60 of them in Zug

All in all
## 20
active VR mandates by Fernandez are found in the Han delsregister. So he is among other things at the Im property finance ing company Crowd house and in the car subscription service Carvolution, except for Racing Unleashed: you operates formula 1 simulators and is from ex-sow ber boss Monisha Kaltenborn headed.

Turnover is already over 400 million francs and is growing by a three-digit percentage every year . "Utopia is already beyond the unicorn," says partner Fernandez. It does not generate profits, all income is invested in further growth. The exit should not take place before 2026.

Even acquired the majority Fernandez on another promising start-up: the one from Eschborn in Hesse

coming Partex with her daughter Innoplexus, founded by Indian management consultant **Gun jan Bhardwaj,** a good friend of Fernandez. This company too has settled Fernandez in Zug. She uses big data and artificial intelligence to develop cancer drugs on behalf of pharmaceutical and biotech companies.

"Innoplexus probably has the largest oncology database in the world," says Fernandez. The company has already registered 140 patents and signed 20 royalty deals. Around a dozen of the approximately 350 employees are based in Zug. At 30 million, sales are still on the low side, but "the potential is many billions," says Fernandez: The company valuation is already close to that of a unicorn. The exit is planned for 2025. For the time being, the priority is to develop further drug assets and conclude additional royalty deals. Another Partex subsidiary called Cureteq is developing its own clinical studies on the same basis.

With Utopia as with Partex, Fernandez takes – how could it be otherwise - an active role: "I'm not just an investor who gives money blindly, I work with and get involved in strategic management," he says.

**MARC KOWALSKY**

# START



<u>RASTLOS</u> Nachdem er bei der verkauften Avaloq nur noch eine Nebenbeschäftigung als VR hat, steckt Fernandez seine Zeit und Energie in Start-ups.

## Einhornfänger

**Francisco Fernandez** Nach dem Verkauf seiner Avaloq hat der Unternehmer bereits wieder zwei neue Milliardenfirmen am Start.

**W**er **Francisco Fernandez** dieser Tage auf den sozialen Medien begegnet, sieht ihn meist umgeben von teuren - häufig alten - Autos. Seitdem er vor zwei Jahren die von ihm aufgebaute Avaloq für über zweieinhalb Milliarden Franken an die japanische NEC verkauft hat, scheint der 59-Jährige das Leben zu geniessen.

Der Schein trügt. «Ich bin nicht der Typ, der jetzt an Stränden herumliegt», sagt er selber: «Ich muss arbeiten, dann bin ich glücklich.» Und so hat der Unternehmer bereits wieder zwei neue Einhörner am Start: In Zug hat er die ursprünglich vom schwedischen Serial Entrepreneur **Mattias Hjelmstedt** in London gegründete Firma Utopia Music angesiedelt. «Die Musikindustrie ist total fragmentiert, outdated, nicht digitalisiert - viel schlimmer als die Bankenindustrie vor 30 Jahren», hat Fernandez festgestellt. Utopia Music entwickelt eine Softwareplattform für das Management von Urheberrechten: «Der Musikindustrie entgeht enorm viel Geld, weil die Royalties nicht effizient eingesammelt und nicht effizient ausgezahlt werden.» Utopia hat eine Technologie entwickelt, um alle Radio- und TV-Stationen zu analysieren, und Kollaborationen mit Streamingdiensten abgeschlossen: «Wir wissen: Wer spielt was wann wo.» 600 Mitarbeiter hat Utopia, 60 davon in Zug, der

Insgesamt

# 20

aktive VR-Mandate von Fernandez finden sich im Handelsregister. So ist er u.a. an der Immobilienfinanzierungsfirma Crowdhouse beteiligt und am Autoabodienst Carvolution, ausserdem an Racing Unleashed: Sie betreibt Formel-1-Simulatoren und wird von Ex-Sauber-Chefin Monisha Kaltenborn geleitet.

Umsatz beträgt schon über 400 Millionen Franken und wächst jedes Jahr im dreistelligen Prozentbereich. «Utopia ist bereits jenseits des Unicorns», sagt Teilhaber Fernandez. Gewinne erwirtschaftet sie nicht, alle Einkünfte werden in das weitere Wachstum gesteckt. Der Exit soll nicht vor 2026 erfolgen.

Gar die Mehrheit erworben hat Fernandez an einem anderen vielversprechenden Start-up: an der aus dem hessischen Eschborn stammenden Partex mit ihrer Tochter Innoplexus, gegründet vom indischen Unternehmensberater **Gunjan Bhardwaj,** einem guten Freund von Fernandez. Auch diese Firma hat Fernandez in Zug angesiedelt. Sie nutzt Big Data und künstliche Intelligenz für die Entwicklung von Krebsmedikamenten im Auftrag von Pharma- und Biotech-Firmen. «Innoplexus hat die wahrscheinlich grösste Onkologie-Datenbank der Welt», sagt Fernandez. Die Firma hat bereits 140 Patente angemeldet und 20 Royalty-Deals unterschrieben. Rund ein Dutzend der etwa 350 Mitarbeiter sitzt in Zug. Noch ist der Umsatz mit 30 Millionen eher gering, aber «das Potenzial liegt bei vielen Milliarden», sagt Fernandez: Bereits jetzt liege die Firmenbewertung nahe am Unicorn. Der Exit ist für 2025 vorgesehen, vorerst hat Priorität, weitere Drug Assets zu entwickeln und zusätzliche Royalty-Deals abzuschliessen. Eine andere Partex-Tochter mit Namen Cureteq entwickelt auf der gleichen Basis eigene klinische Studien.

Bei Utopia wie bei Partex nimmt Fernandez - wie könnte es anders sein - eine aktive Rolle ein: «Ich bin nicht einfach ein Investor, der blind Geld gibt, sondern ich arbeite mit und engagiere mich in der strategischen Führung», sagt er.

**MARC KOWALSKY**

Foto: Helmut Wachter / 13 Photo

# EXHIBIT 2

Innoplexus AG mit Sitz in Frankfurt am Main,
geschäftsansässig in 65760 Eschborn, Frankfurter Straße 27
eingetragen im Handelsregister des Amtsgerichts Frankfurt am Main unter HRB 107950

## Liste der Mitglieder des Aufsichtsrats gemäß § 106 AktG

1.  **Ruben King-Shaw**, Dallas, Texas, U.S.A.
    Executive bei der Steward Health Care System LLC
    *Vorsitzender*

2.  **Christina Pfaff-Benitez, LL.M.**, Eschborn
    General Legal Counsel bei Partex N.V.
    *Stellvertretende Vorsitzende*

3.  **Jayant Bhatt**, New Delhi, Indien
    Rechtsanwalt in eigener Praxis in New Delhi, Indien

4.  **Mohan Murti**, Lennestadt,
    Senior Advisor der Europe Reliance Group

Eschborn, im Mai 2022

Dr. Gunjan Bhatwaj
Vorstand

Holger Hoffmann
Vorstand

Innoplexus AG based in Frankfurt am Main,
with its registered office in 65760 Eschborn, Frankfurter Straße 27
registered with the Commercial Register of the Regional Court of Frankfurt am Main under HRB
107950

## List of supervisory board members according to Sec. 106 of the German Stock Corporation Act (AktG)

1.  **Ruben King-Shaw**, Dallas, Texas, USA
    Executive at Steward Health Care System LLC
    *Chairman*

2.  **Christina Pfaff-Benitez, LL.M.**, Eschborn
    General Legal Counsel at Partex NV
    *Vice Chairman*

3.  **Jayant Bhatt**, New Delhi, India
    Attorney-at-Law with his own office in New Delhi, India

4.  **Mohan Murti**, Lennestadt,
    Senior Advisor at Europe Reliance Group

Eschborn, May 2022

Dr. Gunjan Bharwaj [sic!]                          Holger Hoffmann
Member of the management board          Member of the management board

# EXHIBIT 3

# H C S



HCS - Bockenheimer Landstrasse 2-4 - D-60306 Frankfurt am Main

Dr. Gunjan Bhardwaj
c/o Frankfurter Straße 27
67650 Eschborn

DATUM
09. SEP 2022

SEITEN
1

*Per E-Mail:*

gunjan.bhardwaj@partex.io

| ABSENDER | TELEFON | MAIL |
|---|---|---|
| JOSEF BROICH | +49 69 264826-10 | JBROICH@BROICH.DE |

Sehr geehrter Herr Dr. Bhardwaj,

aus gegebenem Anlass möchte ich Sie an das sog. „Commitment" aus Ziffer 20.1 des „Shareholders´ Agreement relating to Innoplexus AG" vom 3. März 2021 („Aktionärsvereinbarung") erinnern und an die für Sie hieraus resultierenden Pflichten.

Sie haben sich in der Aktionärsvereinbarung in Ihrer Eigenschaft als Vorstand der Innoplexus AG ausdrücklich dazu verpflichtet ihre gesamte Arbeitszeit und Aufmerksamkeit der Gesellschaft zu widmen und darüber hinaus keinerlei Aktivitäten nachzugehen, die geeignet wären diese Verpflichtungen in irgendeiner Weise zu beeinträchtigen.

Namens und in Vertretung der HCS Beteiligungsgesellschaft mbH fordere ich Sie daher zur Abgabe einer entsprechenden Unterlassungserklärung auf, daß Sie diesen Pflichten zukünftig nachkommen werden und insbesondere keine anderen Tätigkeiten ausüben, die ihrer Verpflichtung zur Widmung Ihrer gesamten Arbeitskraft und Aufmerksamkeit gegenüber der Innoplexus AG entgegenstehen oder diese auch nur geringfügig beinträchtigen können.

Zusätzlich fordere ich Sie auf, gegenüber der HCS Beteiligungsgesellschaft mbH jene Tätigkeiten, einschließlich der jeweils hierfür aufgewandten Zeiträume, zu benennen, denen Sie seit Unterzeichnung der Aktionärsvereinbarung nachgekommen sind, die im Widerspruch zu Ihrer Verpflichtung aus Ziffer 20.1. der Aktionärsvereinbarung stehen.

Mit freundlichen Grüßen



(Josef Broich)

HCS-BETEILIGUNGSGESELLSCHAFT MBH MIT SITZ IN FRANKFURT/MAIN — WWW.HCS-BETEILIGUNGEN.DE
BOCKENHEIMER LANDSTRASSE 2-4 — D-60306 FRANKFURT AM MAIN — AMTSGERICHT FRANKFURT HRB 56689
UID: DE233741762 — GESCHÄFTSFÜHRUNG: HANS-CHRISTIAN SEMMLER UND RENATE SEMMLER
BANKVERBINDUNG: IBAN DE84 4584 0026 0660 0795 00 — BIC COBADEFFXXX — COMMERZBANK LÜDENSCHEID

# H C S



HCS - Bockenheimer Landstrasse 2-4 - D-60306 Frankfurt am Main

Dr. Gunjan Bhardwaj
c/o Frankfurter Straße 27
67650 Eschborn

DATE
09. SEP 2022

PAGES
1

*Via e-mail:*

FROM
JOSEF BROICH

PHONE
+49 69 264826-10

MAIL
JBROICH@BROICH.DE

Dear Dr. Bhardwaj,

I would like to take this opportunity to remind you of the so-called "Commitment" in Section 20.1 of the "Shareholders' Agreement relating to Innoplexus AG" dated March 3, 2021 ("Shareholders' Agreement") and of the obligations arising from this for you.

In the Shareholders' Agreement, you have expressly undertaken in your capacity as a member of the Management Board of Innoplexus AG to devote your entire work time and attention to the Company and, beyond that, not to engage in any activities that would be likely to impair these obligations in any way.

Acting for and on behalf of HCS Beteiligungsgesellschaft mbH, I therefore request that you issue a corresponding cease-and-desist declaration stating that you will comply with these obligations in the future and, in particular, that you will not engage in any other activities that violate your obligation to devote your entire work time and attention to Innoplexus AG or that could impair it even slightly.

In addition, I request you to disclose to HCS Beteiligungsgesellschaft mbH all activities, including the respective periods of time spent on them, which you have performed since signing the Shareholders' Agreement that violate your obligation under Section 20.1. of the Shareholders' Agreement.

Yours sincerely

(Josef Broich)

HCS-BETEILIGUNGSGESELLSCHAFT MBH MIT SITZ IN FRANKFURT/MAIN — WWW.HCS-BETEILIGUNGEN.DE
BOCKENHEIMER LANDSTRASSE 2-4 — D-60306 FRANKFURT AM MAIN — AMTSGERICHT FRANKFURT HRB 56689
UID: DE233741762 — GESCHÄFTSFÜHRUNG: HANS-CHRISTIAN SEMMLER UND RENATE SEMMLER
BANKVERBINDUNG: IBAN DE84 4584 0026 0660 0795 00 — BIC COBADEFFXXX — COMMERZBANK LÜDENSCHEID

# EXHIBIT 4

Von: "van de Sande, Carsten" <Carsten.vandeSande@hengeler.com>
Datum: 14. September 2022 um 10:30:40 MESZ
An: "Broich, Josef" <jbroich@broich.de>
Kopie: "Favoccia, Daniela" <Daniela.Favoccia@hengeler.com>, "Jagnjic, Daniel"
<daniel.jagnjic@hengeler.com>, "Palmen, Hannes" <hannes.palmen@hengeler.com>
Betreff: Dr. Gunjan Bhardwaj / HCS - Ihr Schreiben vom 9. September 2022

Sehr geehrter Herr Kollege Broich,

wir nehmen Bezug auf Ihr Schreiben vom 9. September 2022 (anbei), welches Sie im Namen
der HCS Beteiligungsgesellschaft mbH an unseren Mandanten Dr. Gunjan Bhardwaj gerichtet
haben.

Wir vertreten Dr. Gunjan Bhardwaj auch in seiner Eigenschaft als Partei des "Shareholders'
Agreement relating to Innoplexus AG" vom 8. März 2021 und etwaiger sonstiger
Vereinbarungen zwischen den Aktionären der Innoplexus AG. Ordnungsgemäße
Bevollmächtigung wird hiermit versichert. Wir bitten Sie, künftige Korrespondenz in dieser
Angelegenheit ausschließlich an uns zu richten.

Wir werden zu gegebener Zeit auf Ihr Schreiben vom 9. September 2022 zurückkommen.

Mit freundlichen kollegialen Grüßen
Carsten van de Sande


Dr. Carsten van de Sande, LL.M.
Rechtsanwalt | Partner
Attorney-at-Law (New York)

From: "van de Sande, Carsten" <Carsten.vandeSande@hengeler.com>
Date: September 14, 2022 at 10:30:40 CEST.
To: "Broich, Josef" <jbroich@broich.de>
Copy: "Favoccia, Daniela" <Daniela.Favoccia@hengeler.com>, "Jagnjic, Daniel"
<daniel.jagnjic@hengeler.com>, "Palmen, Hannes" <hannes.palmen@hengeler.com>
Subject: Dr. Gunjan Bhardwaj / HCS - Your letter of September 9, 2022.

Dear Mr. Broich,

we refer to your letter dated September 9, 2022 (enclosed), which you addressed to our client
Dr. Gunjan Bhardwaj on behalf of HCS Beteiligungsgesellschaft mbH.

We also represent Dr. Gunjan Bhardwaj in his capacity as a party to the "Shareholders'
Agreement relating to Innoplexus AG" dated March 8, 2021 and any other agreements
between the shareholders of Innoplexus AG. Proper authorization is hereby assured. We
request that you address any future correspondence in this matter exclusively to us.

We will respond to your letter of September 9, 2022 in due course.


Yours faithfully
Carsten van de Sande

# EXHIBIT 5

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

Anlage_Ast.1

HCS · Bockenheimer Landstrasse 2-4 · D-60306 Frankfurt am Main

Innoplexus AG
- Vorstand -
Frankfurter Straße 27
67650 Eschborn
**E-Mail vorab:**
gunjan.bhardwaj@innoplexus.com
holger.hoffmann@innoplexus.com

DATUM
21. OKT 2022

SEITE
1

ABSENDER ·          TELEFON                    MAIL
HANS-CHRISTIAN SEMMLER   +49 173 9019614        H.SEMMLER@HCS-BETEILIGUNGEN.DE

**Verlangen gemäß § 122 Abs. 1 AktG auf Einberufung einer außerordentlichen Hauptversammlung der Innoplexus AG, hilfsweise gemäß § 122 Abs. 2 AktG auf Ergänzung der Tagesordnung der nächsten Hauptversammlung.**

Sehr geehrte Herren,

die HCS Beteiligungsgesellschaft mbH („**HCS**") ist seit mehr als 90 Tagen Inhaberin von Aktien, die einer Beteiligung von mehr als dem zwanzigsten Teil des Grundkapitals der Innoplexus AG („**Innoplexus**" oder „**Gesellschaft**") entsprechen. Dies ergibt sich aus dem Aktienregister der Gesellschaft (§ 67 AktG). Die HCS beabsichtigt, diese Aktien langfristig, jedenfalls bis zu einer rechtskräftigen Entscheidung in einem etwaig erforderlich werdenden Verfahren nach § 122 Abs. 3 AktG und bis zum Ablauf der Hauptversammlung mit den nachfolgend genannten Tagesordnungspunkten zu halten.

Wir weisen der guten Ordnung halber darauf hin, dass die HCS ohne Präjudiz die eingelegte Beschwerde gegen die Entscheidung des Registergerichts vom 3. August 2022 hinsichtlich des Tagesordnungsergänzungsverlangen der HCS vom 10. Februar 2022 zurückgenommen hat. Lediglich aus Gründen der Verfahrensökonomie haben wir uns entschieden, ein neues Einberufungsverlangen mit fokussierten Beschlussanträgen zu stellen, die – nach unserer weiterhin bestehenden Auffassung im Einklang mit der herrschenden Meinung – überobligatorisch die Ersatzansprüche der Gesellschaft gegen Dr. Gunjan Bhardwaj und die Partex N.V. weiter detaillieren und konkretisieren und dabei auch die tatsächlichen Feststellungen des Sonderprüfungsberichts vom 16. September 2022 berücksichtigen.

FORTSETZUNG AUF SEITE 2

HCS-BETEILIGUNGSGESELLSCHAFT MBH MIT SITZ IN FRANKFURT/MAIN — WWW.HCS-BETEILIGUNGEN.DE
BOCKENHEIMER LANDSTRASSE 2-4 — D-60306 FRANKFURT AM MAIN — AMTSGERICHT FRANKFURT HRB 56689
UID: DE233741762 — GESCHÄFTSFÜHRUNG: HANS-CHRISTIAN SEMMLER UND RENATE SEMMLER
BANKVERBINDUNG: IBAN DE84 4584 0026 0660 0795 00 — BIC COBADEFFXXX — COMMERZBANK LÜDENSCHEID

# H C S



**BETEILIGUNGSGESELLSCHAFT MBH**

Falls die Gesellschaft im Zusammenhang mit der Veröffentlichung der Tagesordnungspunkte mit der Einladung unter dem Gesichtspunkt des Datenschutzes Anonymisierungen für erforderlich halten sollte, bitten wir um kurzfristige Rückmeldung zur Abstimmung.

Hiermit verlangt die HCS die Einberufung einer außerordentlichen Hauptversammlung, hilfsweise die Ergänzung der Tagesordnung der nächsten Hauptversammlung, mit den folgenden Punkten:

## 1. Geltendmachung von Ersatzansprüchen gemäß § 147 Abs. 1 AktG

Die HCS Beteiligungsgesellschaft mbH schlägt vor, den folgenden Beschluss zu fassen:

Die Hauptversammlung beschließt gemäß § 147 Abs. 1 Satz 1 AktG, dass die Innoplexus AG (nachfolgend „**Innoplexus**" oder „**Gesellschaft**") Ansprüche der Gesellschaft gegen Dr. Gunjan Bhardwaj gemäß § 93 AktG, § 117 AktG und aus § 317 Abs. 3 AktG sowie gegen Partex N.V. mit Sitz in Amsterdam, Niederlande (nachfolgend „**Partex**", unter Einschluss der vormaligen Firmierungen Partex Capital UG und Partex Capital GmbH") insbesondere aus §§ 117, 317 Abs. 1 AktG, § 113 Abs. 1 HGB analog) – gegebenenfalls gesamtschuldnerisch – geltend macht, die der Innoplexus durch die spätestens ab Januar 2021 von Dr. Gunjan Bhardwaj und Partex beabsichtigte und spätestens im Mai 2021 veranlasste Verlagerung von Geschäftschancen und Kernkompetenzen sowie aus diesen Kernkompetenzen entwickelten Bereiche der Gesellschaft auf das herrschende Unternehmen Partex und mit dieser verbundene Unternehmen (mit Ausnahme der Gesellschaft) im Zusammenhang mit dem nachfolgend kurz umrissenen Sachverhalt entstanden sind:

Die Gesellschaft betreibt u.a. eine selbst entwickelte KI-gestützte Plattform für die Entdeckung und Entwicklung von medizinischen Wirkstoffen und Medikamenten, die Innovationen im Gesundheitswesen vorantreibt. Diese Plattform begründet ein Alleinstellungsmerkmal und stellt einen Wettbewerbsvorteil dar.

Bei der Gesellschaft haben Fachleute aus verschiedenen Disziplinen der Softwareentwicklung durch Patente abgesicherte Fähigkeiten entwickelt, die u.a. die Datenbeschaffung, Datenaggregation, Datenanalyse (einschließlich KI) und Datenvisualisierung umfassen. Mit diesem CAAV genannten Instrumentarium (für **C**rawl, **A**ggregate, **A**nalyze, **V**isualize) kann das Unternehmen unstrukturierte und strukturierte private sowie öffentlich zugängliche Datenmengen analysieren und nutzbar machen (vgl. Seite 35 ff. des Sonderprüfungsberichts von Alvarez & Marsal Disputes and Investigations GmbH vom 16. September 2022, nachfolgend „**Sonderprüfungsbericht**"). Mittels ihrer Entwicklungen in der Blockchain-Technologie kann die Gesellschaft einen sicheren Austausch der gewonnenen Ergebnisse zwischen beliebigen Akteuren orchestrieren. Auf Basis dieser Kernkompetenzen und unter Hinzuziehung von Fachleuten, die die jeweils spezifischen Begriffskonzepte (Ontologien) beherrschen, entwickelt die Gesellschaft Produkte und Leistungen für verschiedene Geschäftsfelder.

Diesen Zusammenhang hat die Gesellschaft bereits im Jahr 2016 in der Präsentation „Innoplexus investor summary deck_v4.0.pdf" – hier ins Deutsche übersetzt – wie folgt dargestellt.

*„Innoplexus ist dabei, den Markt für Datendienste und Analytik als Dienstleistung mit Hilfe von Ontologie, künstlicher Intelligenz, Automatisierung und anderen*

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

*Basistechnologien zu revolutionieren. Wir begannen unser Experiment im Segment der Biowissenschaften mit einer Plattform für Wettbewerbsforschung (Oilbird™) und der weltweit ersten Plattform für die Entdeckung und Verwaltung von Meinungsmachern in Echtzeit (Touchpoint). (...) Wir haben auch eine Plattform (Clarity) entwickelt, um die Leistungsdaten von Arzneimitteln zu automatisieren, indem sie Daten automatisch erfasst und aggregiert und in Echtzeit analysiert. Im Finanzdienstleistungssegment begannen wir mit unserer Ontologie der Rechtssprache das Produkt Regi™ zu entwickeln und ein Modell für die Investment-Ontologie (LEAF) zu konzipieren. Ähnlich haben wir ein Konzept für die Verbrauchsgüter-Industrie anentwickelt. (...) Wir sind das Google der nächsten Generation (...)"*

Im Laufe der nachfolgenden Jahre sind eine ganze Reihe weiterer Produkte an- bzw. fertig entwickelt worden, wie z.B.:

- Unter dem Arbeitstitel „Digital Kosmos Stiftung" (abgekürzt „DKS") beabsichtigte Innoplexus einen Marktplatz in NRW aufzubauen und zu betreiben, welcher einerseits einen effizienten Austausch aktueller Forschungsergebnisse fördert und andererseits einen Nucleus für die Ansiedelung von Unternehmen bietet, die z.B. dessen Funktionalität erweitern und neue Anwendungen auf seiner Basis schaffen kann. Der auf Basis der Entwicklungsarbeit der Gesellschaft im Umfang von mehreren tausend Personenjahren, einer Vielzahl erfolgter Patentanmeldungen und ihrer mehrjährigen erfolgreichen Tätigkeit in der Life Science Industrie zu schaffende Marktplatz sollte Priorität und Urheberrechte fälschungssicher dokumentieren und zum Austausch von Forschungsergebnissen über eine eigene Währung (Token) motivieren.

- Unter dem Arbeitstitel „Smart City Service" sollte gemeinsam mit der Deutschen Bank als Finanzierungspartner für Kommunen ein Angebot zur Umgestaltung der Infrastruktur (z.B. Straßenbeleuchtung) unter dem Aspekt der Nachhaltigkeit und Kosteneinsparung entwickelt werden.

- Unter dem Arbeitstitel „Innoplexus' LS AI Fund" bot Innoplexus Kapitalfonds den Service an, klinische Studien von börsennotierten Pharma-Unternehmen aufgrund öffentlich zugänglicher Informationen auszuwerten, die Wahrscheinlichkeit der erfolgreichen Zulassung von Medikamenten zu ermitteln und Investitionsentscheidungen vorzubereiten.

Diese Beispiele zeigen, dass nicht nur die entwickelten Angebote von Innoplexus, sondern die zugrunde liegenden Kernkompetenzen Geschäftschancen des Unternehmens darstellen.

In den Bereichen „Financial Services" (vgl. Seite 44 bis 46 des Sonderprüfungsberichts, Präsentation „Innoplexus Blockchain Platform – Solution for Payments and Banking" aus dem Jahr 2020) hat die Gesellschaft verschiedene Strategien entwickelt und konkret verfolgt. Die Gesellschaft verfolgte auch die Unternehmensstrategie, Arzneimittelkandidaten, die sich in einem frühen Entwicklungsstadium befinden oder deren Entwicklung aufgegeben wurde, im Rahmen eines so genannten „Asset Equity Partnership Model" („AEPM") anzukaufen und einzulizenzieren (vgl. Sonderprüfungsbericht, Seite 43 f.; Präsentation der Gesellschaft aus dem Dezember 2020 mit dem Titel „Leveraging AI for Indication prioritization: Sucess stories of Big Pharme early phase and discounted asses revival, insbes. Seite 11 und 13). In einer E-Mail vom 14. Februar

# H C S



BETREFF                                                                                     SEITE
EINBERUFUNGSVERLANGEN                                                                       4/13

2021 an einen potentiellen Investor teilte Dr. Gunjan Bhardwaj mit, dass Innoplexus in Kürze Rechte an Arzneimittelkandidaten von relevanten Pharmaunternehmen bekommen werde (S. 56 des Sonderprüfungsberichts). Dr. Gunjan Bhardwaj führte im Januar 2021 in einer Präsentation von Innoplexus („The world's most advanced AI-powered platform covering the entire research and development value chain") – hier ins Deutsche übersetzt – aus: „2020 hat Innoplexus in die Top-Liga der virtuellen Biotechs mit End-to-End-KI katapultiert".

Noch im Dezember 2020, in einer Phase als die Kapital- und Liquiditätssituation der Gesellschaft kritisch und die weitere Finanzierung ungewiss war, hat die Gesellschaft in einer Präsentation („Potential Structure of collaboration") zur Etablierung einer SPV Struktur mit Fresenius und Deloitte diesen umfassenden Ansatz konkret verfolgt, wobei auch aus dieser vom Sonderprüfer offenbar nicht berücksichtigten Präsentation bereits deutlich wurde, dass Dr. Gunjan Bhardwaj einen Einstieg des Investors Futury nicht direkt bei der Gesellschaft verfolgte, sondern privat bei seiner Beteiligungsgesellschaft Partex N.V. auf der Grundlage einer „discount valuation".

In dieser Zeit war die Minderheitsbeteiligung der Partex an der Gesellschaft der einzige wesentliche Vermögenswert der Partex (vgl. Seite 22 des Sonderprüfungsberichts). In einer E-Mail vom 19. Juni 2017 hatte Dr. Gunjan Bhardwaj zugesichert, dass die Partex-Gründung allein steuerliche Ursachen habe und sich durch die Übertragung eines Teils seiner Aktien auf die Partex für die übrigen Aktionäre sonst nichts ändern werde. Mit der Präsentation „Partex Investment Deck" aus dem Januar 2021 (nachfolgend „Tatplan") warb Dr. Gunjan Bhardwaj jedoch offen um einen Investor für eine Investition bei der Partex statt bei der Innoplexus. Diese Präsentation skizziert den Tatplan, wonach – in diametralem Widerspruch zur Zusicherung von Dr. Gunjan Bhardwaj vom 19. Juni 2017 – künftig Partex als „neue Innoplexus" etabliert werden soll, und bestimmte aus den Innoplexus-Kernkompetenzen entwickelte Geschäftsbereiche zukünftig von der Partex verfolgt werden sollen.

Wesentliche Elemente des skizzierten Tatplans nach Einstieg eines Investors bei Partex waren, dass (1) Partex Mehrheitsaktionär „>50%" der Innoplexus wird, dass (2) eine BioTech Platform (damals als „CureTec" bezeichnet) aufgesetzt wird für die Nutzung von KI-Technologie zur Weiterentwicklung und Monetarisierung von „failed assets", d.h. nicht zum Abschluss gebrachter Pharma- und BioTech-Forschungsprojekte mit unklaren Erfolgsaussichten, das – wie die Präsentation auch aufzeigt – ein von Innoplexus entwickeltes Geschäftsfeld darstellt, dass (3) ein „Hedge Fund Life Sciences" aufgesetzt wird und dass (4) eine DeepTech Blockchain Subco aufgesetzt wird, wofür Partex die Abwerbung eines Teams von Innoplexus in Deutschland und Indien im Bereich Blockchain beabsichtigte („High performance lean Team to be taken over in Germany and India with expertise in both Public and Private Blockchain and distributed ledger technologies") und Blockchain-Kompetenzen entwickeln wird, wobei es auch um die Entwicklung einer „Hyperledger Fabric Blockchain" mit Kapazitäten für mehr als 2.3 Milliarden Transaktionen für einen „asian payments regulator" geht. All diese in der Präsentation Partex Investment Deck für die Partex aufgezeigten künftigen Bereiche beruhen auf den Kernkompetenzen der Innoplexus. Die von Innoplexus mit ihren Kernkompetenzen entwickelten Bereiche Ankauf und die Entwicklung von Arzneimittelkandidaten und Financial Services wurden Partex zugeordnet.

Auf dieser Grundlage hat dann der Investor Francisco Fernandez über Beteiligungsgesellschaften in Partex investiert. Ein Teil des bei Partex investierten Geldes ist dann über eine am 8. März 2021 beschlossene Kapitalerhöhung Innoplexus zugeflossen sowie für den Erwerb von weiteren Aktien genutzt worden, so dass Partex Ende März 2021 die Mehrheit an Innoplexus erlangte (vgl. Seite 19 f. des Sonderprüfungsberichts). Mit anderen Teilen des Kapitals wurden Strukturen aufgebaut, um die in der Präsentation aufgezeigten Kernkompetenzen der Innoplexus künftig auf eigene Rechnung zu verfolgen.

Obwohl Dr. Gunjan Bhardwaj nach § 20 Abs. 1 der zwischen allen Aktionären und der Gesellschaft bestehenden Aktionärsvereinbarung (Shareholders' Agreement relating to Innoplexus AG vom 25. März 2019 wie auch vom 8. März 2021) verpflichtet war, seine gesamte Arbeitskraft und Aufmerksamkeit der Gesellschaft zu widmen, hat er den in der Präsentation der Partex aus dem Januar 2021 niedergelegten Tatplan nach der Kapitalerhöhung weiter Schritt für Schritt für Partex umgesetzt. Partex hat die Tochtergesellschaften CureTeq AG mit der Enkelgesellschaft Oncoteq AG und Perpetual Block AG mit der Enkelgesellschaft PerpetualBlock Technologies Pvt. Ltd. im zweiten Quartal 2021 etabliert (vgl. Seite 22 f. des Sonderprüfungsberichts). Aus den Feststellungen des Sonderprüfungsberichts ist belegt, dass Dr. Gunjan Bhardwaj gegen § 20 Abs. 1 der Aktionärsvereinbarung verstoßen hat. Der Sonderprüfungsbericht zeigt weiter auf, dass – wie im schriftlichen Tatplan vorgesehen – zahlreiche Mitarbeiter von Innoplexus zu Partex oder mit dieser verbundenen Unternehmen gewechselt sind (vgl. Seite 45, 46, 68, 75 des Sonderprüfungsberichts).

Im Sonderprüfungsbericht wird ausgeführt, dass es bei der Gesellschaft seit dem 26. Mai 2021 zu einer Neuausrichtung kam, da die beiden Geschäftsfelder Financial Services und die Weiterentwicklung von einlizenzierten Arzneimittelkandidaten im Rahmen von AEPM in der Aufsichtsratssitzung vom Vorstand nicht mehr als Kerngeschäftsfelder genannt wurden. Dabei wurden aber weder aufzugebende Geschäftsbereiche benannt, noch eine Geschäftsbereichsaufgabe ausdrücklich vom Aufsichtsrat beschlossen (vgl. Seite 44, 46 und Seite 58 des Sonderprüfungsberichts). Die faktische Nichtweiterverfolgung dieser beiden Bereiche durch den Vorstand erfolgte auf Veranlassung der Partex, denn die entsprechende Erwartung der Partex ergibt sich ohne weiteres aus dem Tatplan, der jedenfalls Vorstandsmitglied Dr. Gunjan Bhardwaj auf Seiten der Gesellschaft bekannt war. Soweit die Gesellschaft dennoch weiter im Markt aufgetreten ist (vgl. Seite 54, 58 des Sonderprüfungsberichts), erfolgte dies in Angelegenheiten, die später der Partex überlassen wurden.

Dr. Gunjan Bhardwaj und die Partex haben ihren Einfluss auf den Vorstand der Innoplexus genutzt und diesen veranlasst, keine eigenständige Finanzierung für die Umsetzung der Geschäftschancen auf der Ebene der Gesellschaft sicherzustellen. Auch nach den Feststellungen des Sonderprüfungsberichts sind Startup-Unternehmen wie Innoplexus üblicherweise auf die externe Finanzierung durch Kapitalgeber angewiesen (vgl. Seite 18 Fn. 3 des Sonderprüfungsberichts). Dr. Gunjan Bhardwaj hat jedoch lediglich die Finanzierung seiner privaten Beteiligungsgesellschaft Partex sichergestellt, nicht aber die unmittelbare hinreichende Finanzierung der Innoplexus. Diese Finanzierung von Partex zum Zwecke des Aufbaues von operativen eigenen Geschäftsfeldern jenseits des bloßen Haltens der Beteiligung an Innoplexus

FORTSETZUNG AUF SEITE 6

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

widerspricht den ausdrücklichen Zusicherungen von Dr. G. Bhardwaj vom 19. Juni 2017 gegenüber den Aktionären. Die zur Einwerbung von Fremdmitteln zur Verfügung stehenden Möglichkeiten für die Gesellschaft hat Dr. Gunjan Bhardwaj in seiner Eigenschaft als Vorstand der Gesellschaft nicht genutzt. Weder hat er

- ein Angebot von APEIRON aufgegriffen, die Arzneimittelentwicklung über ein SPV von Innoplexus zu finanzieren, noch

- das Angebot von APEIRON verfolgt, einen SPAC-Merger zu organisieren, noch

- die im Januar 2021 vom Vorstand als realistisch propagierte Möglichkeit verfolgt, eine Kapitalerhöhung umzusetzen, sei es in Höhe von EUR 30 Mio. mit Investoren (Bill Yuan/ Simone Giamocelli), mit denen er schon seit Monaten hierüber laut seinen Berichten erfolgversprechend verhandelte oder durch Aufnahme von Roivant als Mehrheitsaktionär, noch

- die potenten Aktionäre HCS Beteiligungsgesellschaft mbH, Finlab und Leon Amram auf eine SPV-Finanzierung der Arzneimittelentwicklung angesprochen, noch

- das Angebot der HCS Beteiligungsgesellschaft mbH aufgegriffen und verhandelt, das Projekt Curia anzukaufen, noch

- die vom Vorstand nicht mehr als Werttreiber bezeichneten Unternehmensbereiche (mit oder ohne vorherige Verselbständigung) zu verkaufen, obwohl diese – wie die Gründung und Finanzierung der Perpetual Block AG und CureTeq AG durch Partex belegt – einen Marktwert haben.

Dr. Gunjan Bhardwaj schrieb in seiner für Herrn Christian Angermayer verwendeten Präsentation „Innoplex_2021_Plan_Confidential_GB_V1.3.pptx" u.a. „Jeffries suggests Innoplexus an 'ideal' deal for SPACs". In derselben Präsentation wies Dr. Gunjan Bhardwaj auf weitere seines Erachtens bestehende Finanzierungsmöglichkeiten hin.

Wie sich aus den Feststellungen im Sonderprüfungsbericht zu den finanziellen Verhältnissen der Gesellschaft ergibt (vgl. Seite 76 des Sonderprüfungsberichts), wurden weitere Finanzierungen zur Weiterverfolgung der beiden Kernkompetenzen nicht umgesetzt. Der Sonderprüfungsbericht zeigt vielmehr, dass es im Zusammenhang mit dem von Innoplexus verfolgten Erwerb des Wirkstoffes M8891 keinerlei schriftliche Dokumentation dafür gab, dass von der Gesellschaft auch andere potentielle Investoren angesprochen wurden, wie dies Dr. Gunjan Bhardwaj zunächst gegenüber dem Sonderprüfer behauptete (Seite 56 des Sonderprüfungsberichts). Weitere Kapitalmaßnahmen bei der Gesellschaft, bei denen die bestehenden Aktionäre oder neue Investoren die Kapitalbasis weiter stärken, wurden vom Vorstand Dr. Gunjan Bhardwaj nicht mehr vorbereitet.

Dass bei redlicher Bemühung des Vorstands Dr. Gunjan Bhardwaj eine Finanzierung für Innoplexus umsetzbar gewesen wäre, zeigt sich bereits darin, dass es Dr. Gunjan Bhardwaj für die Partex gelungen ist, einen Investor für eine leere Hülle (außer der Minderheitsbeteiligung an der Gesell-

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

schaft) zu finden, obwohl die künftige Nutzung der Kernkompetenzen von Innoplexus rechtlich für Partex überhaupt nicht gesichert war.

Durch diese Veranlassungen ist für Innoplexus der Nachteil entstanden, die entwickelten Kernkompetenzen nicht mehr mit dem vollen Gewinnpotential selbst zu nutzen. Der Zugriff der Partex auf die Kernkompetenzen der Innoplexus zum Aufbau eigener operativer Aktivitäten in diesem Bereich über die neu gegründeten Tochter- und Enkelgesellschaften erfolgte unentgeltlich.

Die in dem in der Hauptversammlung am 16. Mai 2022 gefassten Beschluss zur Bestellung des Sonderprüfers genannten Verträge ändern nichts an den durch Partex und Dr. Gunjan Bhardwaj der Gesellschaft zugefügten Nachteilen. Vorliegend hat nämlich ein Unternehmen (Innoplexus) einem anderen Unternehmen (Partex) zunächst umfassenden Zugang zu den Räumlichkeiten und Mitarbeitern des eigenen Unternehmens sowie zum Know-how des Vorstands der Gesellschaft (Dr. Gunjan Bhardwaj) gestattet, damit dieses fremde dritte Unternehmen auswählen kann, in welchen Bereichen es selbst künftig Geschäfte machen will. Im Anschluss hieran wurden mit Innoplexus lediglich Service- und Dienstleistungsverträge abgeschlossen, obwohl umfassend Strategien und Know-how von Innoplexus genutzt werden. Echten Drittunternehmen, bei denen Dr. Gunjan Bhardwaj weder CEO noch maßgeblich beteiligt ist, steht ein solches Vorgehen naturgemäß überhaupt nicht offen. Hier hat der Vorstand der Gesellschaft Dr. Gunjan Bhardwaj seiner Beteiligungsgesellschaft Partex Zugriff auf Know-how, Mitarbeiter, Geschäftspartner und Kontakte eröffnet, wie man dies gegenüber einem fremden Dritten naturgemäß und vernünftigerweise niemals macht. Der nachträgliche Abschluss von dies kaschierenden Verträgen kann die Pflichtverletzung und die bereits im Ansatz einem Drittvergleich gar nicht zugängliche Konstellation, der ein permanenter Interessenkonflikt inhärent ist, nicht beseitigen.

Im Übrigen hat der Sonderprüfer im Sonderprüfungsbericht festgestellt, dass Verträge erst nachträglich geschlossen wurden und rückdatiert wurden und bereits vor der rückdatierten Geltung von Verträgen Leistungen erbracht wurden, teilweise sogar ohne Geheimhaltungsvereinbarung (vgl. beispielsweise Seite 55, 56, 90, 97, 99 und 112 des Sonderprüfungsberichts). In diesen Fällen sind Nachteile der Gesellschaft somit festgestellt.

Dem Sonderprüfungsbericht ist auch zu entnehmen, dass sich die Gesellschaft zunächst über das an die Gesellschaft im April 2021 herangetragene Failed Clinical Asset M8891 selbst über eine noch zu gründende Zweckgesellschaft sichern wollte, dann aber auf Veranlassung von Dr. Gunjan Bhardwaj und Partex von der CureTeq AG übernommen und dann einlizenziert wurde (Seite 54 ff. des Sonderprüfungsberichts). Der Nachteil besteht für Innoplexus darin, dass die vollen Gewinnpotentiale bei der CureTeq AG realisiert werden, während Innoplexus nur eine limitierte Vergütung (vgl. Seite 85 f. des Sonderprüfungsberichts) im Rahmen des Dienstleistungsvertrags erhalten soll.

Auch die von der Innoplexus aufgenommenen Prüfungen und Verhandlungen zu den beiden Wirkstoffen OX40 und NI-1401 wurden zwischenzeitlich von der CureTeq AG auf eigene Rechnung übernommen (Seite 56 f. des Sonderprüfungsberichts).

FORTSETZUNG AUF SEITE 8

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

Die Enkelgesellschaft von Partex, PerpetualBlock Technologies Pvt. Ltd., führt nach den Feststellungen des Sonderprüfungsberichts Bewertungen von alternativen Vermögensgegenständen für Dritte durch (Alternate Assets – Valuation). Bei diesen Vermögensgegenständen kann es sich um beliebige handeln, etwa um Supersportwagen, Kunst oder Musik (Seite 70 des Sonderprüfungsberichts). Die von Innoplexus entwickelte Technologie wird somit auch im Partex-Konzern für die Erbringung von Finanzdienstleistungen auf eigene Rechnung genutzt. Ein auf Veranlassung von Dr. Gunjan Bhardwaj und Partex zwischen der Innoplexus Consulting Services Pvt. Ltd. und der PerpetualBlock Technologies Pvt. Ltd. geschlossener Rahmen- und Dienstleistungsvertrag erfolgte nach Angaben des Managements der PerpetualBlock Technologies Pvt. Ltd. zu „Trainingszwecken", um die Technologien von Innoplexus auf eigene Rechnung für „andere Einsatzgebiete zu adaptieren" (Seite 71 des Sonderprüfungsberichts). Die ermöglichte Adaption der Kernkompetenz der Innoplexus auf andere Gebiete durch Konzerngesellschaften von Partex ist – unabhängig von einer fehlenden Gegenleistung – nachteilig für Innoplexus.

Im Sonderprüfungsbericht sind vielschichtige Beziehungen und Aktivitäten zwischen der Gesellschaft und der Partex und deren Tochtergesellschaften festgestellt. Aus dem Vortrag der Gesellschaft in einer Auskunftsklage vor dem Landgericht Frankfurt am Main (Az. 3-05 O 63/22) ergibt sich, dass die Gesellschaft jedenfalls bis zum Zeitpunkt der außerordentlichen Hauptversammlung am 16. Mai 2022 noch kein Nachteilserfassungssystem implementiert hatte. Im Sonderprüfungsbericht ist weiterhin festgestellt, dass die Gesellschaft keinen Abhängigkeitsbericht erstellt (Seite 16 des Sonderprüfungsberichts).

Es sollen alle in den Anwendungsbereich von § 147 Abs. 1 AktG fallenden Ansprüche gegen Dr. Gunjan Bhardwaj und Partex geltend gemacht werden.

Die Geltendmachung der Ansprüche gegen Dr. Gunjan Bhardwaj und Partex umfasst alle aus den nach dem vorstehend skizzierten Sachverhalt entstandenen Schäden, die der Höhe nach ggf. durch die Geltendmachung von Auskunftsansprüchen und Einholung von Sachverständigengutachten konkretisiert werden können.

Die Geltendmachung der Ansprüche gegen Partex erfasst aber auch die Beseitigung der fortwährenden Schädigung von Innoplexus durch Partex und deren Konzernunternehmen durch die Nutzung von Kernkompetenzen der Innoplexus und daraus entwickelter Bereiche und für neue Anwendungsfelder auf eigene Rechnung und die Durchsetzung eines aus der Treuepflicht bestehenden Wettbewerbsverbots der Großaktionärin Partex und deren Konzernunternehmen, die in den von Innoplexus aufgebauten Bereichen und mit den von Innoplexus entwickelten Kernkompetenzen nach der Mehrheitsübernahme im März 2021 durch den Aufbau der eigenen operativen Aktivitäten über Konzerngesellschaften auf der Basis des schriftlichen Tatplans neu und erstmalig in den Wettbewerb getreten sind.

## 2. Bestellung eines besonderen Vertreters nach § 147 Abs. 2 Satz 1 AktG

Die HCS Beteiligungsgesellschaft mbH schlägt vor, den folgenden Beschluss zu fassen:

Die Hauptversammlung bestellt Herrn Rechtsanwalt Stefan Behrendt, Telemannstr. 1, 95444 Bayreuth, zum besonderen Vertreter gemäß § 147 Abs. 2 Satz 1 AktG zur Durchsetzung der vor-

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

stehend unter Tagesordnungspunkt 1. bezeichneten Ersatzansprüche. Der besondere Vertreter kann geeignete Hilfspersonen zur Geltendmachung der Ersatzansprüche heranziehen und sich insbesondere rechtlich und in technischer/wirtschaftlicher Hinsicht beraten und unterstützen lassen. Der besondere Vertreter wird insbesondere dazu ermächtigt, namens der Innoplexus AG das Vertragsverhältnis mit den Hilfspersonen und Beratern zu üblichen Konditionen auszuhandeln und rechtsverbindlich abzuschließen.

Ersatzansprüche sollen dabei nicht nur beschränkt auf Schadensersatz in Geld geltend gemacht werden, sondern der besondere Vertreter ist ebenfalls ermächtigt, Ansprüche auf Naturalrestitution oder solche, die auf Unterbindung einer fortdauernden Schädigung gerichtet sind, geltend zu machen. Der besondere Vertreter ist auch ermächtigt, Ersatzansprüche ggf. in einem Adhäsionsverfahren gemäß §§ 403 f. StPO geltend zu machen. Ebenfalls von der Ermächtigung erfasst werden ausdrücklich auch Nebenansprüche auf Auskunftserteilung, Rechnungslegung und ggf. Feststellung der Verpflichtung zur Schadensersatzleistung, soweit Schäden noch nicht abschließend beurteilt werden können.

Dem besonderen Vertreter kommt die Befugnis zu, selbst eine rechtliche und/oder tatsächliche Prüfung der Ersatzansprüche vorzunehmen.

## 3. Bestellung eines Sonderprüfers nach § 142 Abs. 1 AktG

Die HCS Beteiligungsgesellschaft mbH schlägt vor, den folgenden Beschluss zu fassen:

Die Hauptversammlung bestellt Herrn Rechtsanwalt Wolfgang Jahn, Milanring 11, 14558 Nuthetal, zum Sonderprüfer. Er kann geeignete Hilfspersonen zur Prüfung heranziehen.

Die Sonderprüfung gemäß § 142 Abs. 1 AktG hat die nachfolgend aufgeführten Vorgänge der Geschäftsführung zum Gegenstand und dient der Aufdeckung von Pflichtwidrigkeiten und Verstößen gegen das Aktien- und Konzernrecht durch Mitglieder des Vorstands und des Aufsichtsrats der Innoplexus AG:

1) Ist es im Nachgang zum Schreiben der HCS Beteiligungsgesellschaft mbH vom 6. Februar 2022, der E-Mail vom 7. Februar 2022 an die damaligen Mitglieder des Aufsichtsrats mit dem Betreff „Innoplexus – Document retention and preservation" und dem Tagesordnungsergänzungsverlangen bis zum Abschluss der in der außerordentlichen Hauptversammlung am 16. Mai 2022 beschlossenen Sonderprüfung zu Löschungen, Manipulationen und Beweisunterdrückung gekommen?

2) Haben Mitglieder des Aufsichtsrats unter Ausschluss des damaligen Aufsichtsratsmitglieds Hans-Christian Semmler mit Mitgliedern des Vorstands unter Einschluss von Dr. Gunjan Bhardwaj als Adressat der von der HCS Beteiligungsgesellschaft mbH erhobenen Vorwürfe zum Inhalt und zum Umgang mit diesen Vorwürfen vor Eingang des Einberufungsverlangens der HCS Beteiligungsgesellschaft mbH beim Vorstand am 10. Februar 2022 kommuniziert?

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

3) Ab welchem Zeitpunkt hatten Berater von Vorstand und Aufsichtsrat, die mit der Aus-
einandersetzung zwischen der Gesellschaft und der HCS Beteiligungsgesellschaft mbH
befasst waren, Kenntnis von (1) der nachträglichen Erstellung und Rückdatierung von
Dokumenten, wie im Sonderprüfungsbericht vom 16. September 2022 festgestellt, (2) von
der Tatsache, dass bei der Gesellschaft kein Abhängigkeitsbericht erstellt wird, (3) von der
Präsentation von Dr. Gunjan Bhardwaj aus dem Januar 2021 mit dem Titel „Partex Invest-
ment Deck", (4) von Leistungserbringungen der Gesellschaft gegenüber Konzerngesell-
schaften der Partex N.V. ohne vertragliche Grundlage, (5) unvollständigen bzw. verweiger-
ten Informationen gegenüber dem in der außerordentlichen Hauptversammlung am 16. Mai
2022 bestellten Sonderprüfer, und welche Konsequenzen haben Vorstand und Aufsichtsrat
jeweils aus einer etwaigen Kenntnis der Berater für die Zusammenarbeit gezogen?

4) Gab es zwischen Mitgliedern des Vorstands und des Aufsichtsrats bzw. deren Beratern auf
der einen Seite und den Organmitgliedern der Partex N.V. bzw. deren Beratern auf der
anderen Seite Abstimmungen oder kollusives Handeln im Zusammenhang mit (1) den von
der HCS Beteiligungsgesellschaft mbH im Tagesordnungsergänzungsverlangen vom 10.
Februar 2022 vorgebrachten Vorwürfen, (2) der Vorbereitung und Durchführung der außer-
ordentlichen Hauptversammlung vom 16. Mai 2022, (3) von der HCS Beteiligungsgesell-
schaft mbH geführten Verfahren oder diese betreffenden Schreiben und (4) der Vorberei-
tung und Begleitung der in der außerordentlichen Hauptversammlung am 16. Mai 2022
beschlossenen Sonderprüfung?

Zur Aufklärung der vorstehenden Prüfungsgegenstände wird der Sonderprüfer ermächtigt, nach
eigenem Ermessen Personen zu befragen sowie Zugriff auf sämtliche Unterlagen (auch in elek-
tronischer Form) der Innoplexus AG und deren verbundenen Unternehmen zu nehmen, insbeson-
dere auf Dokumentationen der Vorstands- und Aufsichtsratssitzungen, Korrespondenz (auch in
elektronischer Form) zwischen Organen, Mitgliedern und Angestellten der Gesellschaft sowie die
Korrespondenz (auch in elektronischer Form) zwischen der Gesellschaft und ihren Rechtsberatern
sowie sonstigen Beratern einschließlich sämtlicher Stellungnahmen und Gutachten. Die Sonder-
prüfung bezieht sich ausdrücklich auch darauf, ob und inwieweit Dokumente (unter Einschluss
elektronischer Dokumente) im Zusammenhang mit den vorstehenden Prüfungsgegenständen
nachträglich geändert oder beseitigt wurden bzw. ob es Anweisungen hierzu gab.

## Begründung:

Der Zweck dieses Verlangens ergibt sich aus den vorstehenden Beschlussgegenständen und den entspre-
chenden Beschlussvorschlägen. Die zeitnahe Befassung der Hauptversammlung ist erforderlich, um weitere
Schäden von der Gesellschaft abzuwenden.

### I. Zu den Tagesordnungspunkten 1 und 2

Der Sachverhalt ist ausführlich im Beschlussvorschlag dargelegt. Wir verweisen noch einmal auf die im
Tagesordnungsergänzungsverlangen vom 10. Februar 2022 benannten öffentlichen Äußerungen. Im Septem-
ber 2021 haben die Herren Dr. Gunjan Bhardwaj und Francisco Fernandez nachweisbar auch gar keinen Hehl

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

daraus gemacht, dass sie mit der Partex in den Geschäftsfeldern der Geschäftschancen der Gesellschaft tätig sind.

Dr. Gunjan Bhardwaj bestätigt in öffentlichen Äußerungen auch, dass für ihn nun Partex N.V. die Bedeutung hat, die früher die Innoplexus hatte, indem er seine Vision von der Innoplexus AG kurzer Hand auf die Partex überträgt.

Noch im Jahr 2019 wurde Bhardwaj's Vision von der Neuen Züricher Zeitung porträtiert:

> „Schockiert über die Erkrankung seines Freundes, suchte Bhardwaj Informationen über dessen Tumor, über Spezialisten und Therapien. Dabei habe er festgestellt, dass Antworten auf solche Fragen über das Internet kaum zu finden seien, sagt er. Das einschlägige Wissen wachse rasant, und es sei schwierig, aus der Überfülle relevante und hochwertige Daten herauszufiltern und Querverbindungen zwischen verstreuten Informationen zu erkennen. Als er darüber mit seinem Vater diskutiert habe, habe dieser geraten: «Don't complain, act!» («Beklage dich nicht, tu etwas!»). Und so machte sich Bhardwaj zusammen mit einigen Studienkollegen an die Arbeit. Nach vierjährigem Tüfteln gründeten sie Ende 2015 die Innoplexus AG. Deren Geschäftsidee liegt darin, mithilfe selbstentwickelter künstlicher Intelligenz (KI) und maschinellem Lernen Daten im Bereich Life-Sciences zu suchen, zu strukturieren, in einen logischen Zusammenhang zu bringen und über Lizenzen und Partnerschaften zahlenden Nutzern zur Verfügung zu stellen." (Quelle: https://www.nzz.ch/wirtschaft/innoplexus-gruender-bhardwaj-will-ki-gegen-krebs-einsetzen-nzz-ld.1523063)

Inzwischen hat Dr. Bhardwaj seine Geschichte umgeschrieben. So sagte er in einem englischsprachigen Interview mit dem indischen Wirtschafts- und Finanznachrichtensender ET Now:

> „Als bei meinem ersten Chef und einem sehr guten Freund eine lebensbedrohliche Krankheit diagnostiziert wurde, sah ich zum ersten Mal Hoffnungslosigkeit direkt in meine Augen blicken. Und das ist der Auslöser für die Gründung von Partex. Das erste digitale Pharmaunternehmen weltweit, das wir kontinuierlich aufbauen, um die Langlebigkeit und Gesundheit der Menschheit zu verbessern."
> (Quelle: https://www.youtube.com/watch?v=fnJ8v82D0kI; Übersetzung durch HCS).

Diese Darstellung ist geradezu absurd, weil die Gründung von Partex ursprünglich nur aus steuerlichen Gründen als Beteiligungsgesellschaft und außerdem deutlich später als die Gründung von Innoplexus erfolgte. Das neue Storytelling zeigt aber, dass Dr. Gunjan Bhardwaj die Partex mittlerweile als das „neue Innoplexus" betrachtet, nachdem von Innoplexus entwickelte Kernkompetenzen und Geschäftsfelder auf die Partex verlagert wurden.

Es bestehen daher umfassende Ersatzansprüche:

Dies sind zunächst Schadensersatzansprüche wegen Pflichtverletzungen des Vorstandsvorsitzenden Dr. Gunjan Bhardwaj gemäß § 93 AktG.

Dies sind zum anderen Ansprüche nach § 117 AktG gegen die Partex und Dr. Gunjan Bhardwaj.

Hinzukommen insbesondere konzernrechtliche Ansprüche gemäß § 317 Abs. 1 AktG, die sich gegen das herrschende Unternehmen Partex richten sowie nach § 317 Abs. 3 AktG gegen das Organmitglied Dr. Gunjan

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

Bhardwaj. Die Umlenkung von Geschäftschancen von der abhängigen Gesellschaft auf das herrschende Unternehmen oder ein sonstiges Konzernunternehmen stellt ebenso wie der Zugriff auf Immaterialgüterrechte der abhängigen Gesellschaft durch das herrschende Unternehmen im Sinne von § 311 AktG eine nachteilige sonstige Maßnahme für die Gesellschaft dar (vgl. Habersack, in: Emmerich/Habersack, Aktien- und GmbH-Konzernrecht, 8. Aufl., § 311 Rn. 51 m.w.N.), wenn die Nachteile – wie vorliegend – nicht während des Geschäftsjahrs ausgeglichen wurden bzw. bis spätestens zum Ende des Geschäftsjahres ein Nachteilsausgleich konkret bestimmt wurde. Wir verweisen darauf, dass die Veranlassungen zur faktischen Aufgabe von Geschäftsbereichen und der unterlassenen Finanzierungsbemühungen auf der Ebene der Gesellschaft sowie der Verlagerung der konkreten Geschäftschance hinsichtlich des Wirkstoffs M8891 und sonstiger konkreter Nachteile aufgrund des bestehenden Doppelmandats von Dr. Gunjan Bhardwaj als Vorstand des abhängigen und Geschäftsführer des herrschenden Unternehmens vermutet werden (vgl. Altmeppen, in: Münchener Kommentar AktG, 6. Aufl., § 311 Rn. 87 ff.).

Abgesehen davon ist eine Betätigung des herrschenden Unternehmens Partex und ihrer Konzernunternehmen im Wettbewerb zur Innoplexus per se rechtswidrig, da als Ausprägung der mitgliedschaftlichen Treuepflicht ein Wettbewerbsverbot des Großaktionärs bei nichtbörsennotieren Aktiengesellschaften entsprechend § 113 Abs. 1 HGB besteht (vgl. Habersack, in: Emmerich/Habersack, Aktien- und GmbH-Konzernrecht, 8. Aufl., vor § 311 Rn. 51 Rn. 7 m.w.N. Die tatbestandlichen Besonderheiten der Entscheidung des BGH vom 25. Juni 2008 - II ZR 133/07 – liegen hier nicht vor, da die Partex N.V. mit Tochtergesellschaften erst nachträglich mit der Gesellschaft in Wettbewerb getreten ist.).

## II. Zum Tagesordnungspunkt 3

Wie sich aus Tagesordnungspunkt 1 ergibt, haben Dr. Gunjan Bhardwaj und die Partex durch konsequente und rücksichtslose Umsetzung ihres in der Präsentation Partex Investment Deck vom Januar 2021 dokumentierten Tatplans der Gesellschaft großen Schaden zugefügt und tun dies weiterhin. Vor diesem Hintergrund haben Vorstand und Aufsichtsrat und deren Berater ausschließlich die Interessen der Gesellschaft zu vertreten ohne jede Rücksichtnahme auf private Interessen der Schädiger Dr. Gunjan Bhardwaj und Partex. Vor diesem Hintergrund ist die Ermittlung durch einen Sonderprüfer, wann deren Berater Kenntnis von relevanten Informationen erhalten haben und inwieweit mit den Schädigern und deren Beratern Abstimmungen und Zusammenarbeit stattgefunden hat, relevant für die Beurteilung der Pflichtgemäßheit des Handelns der Organmitglieder als Auftraggeber der Berater und für Regressfragen.

## III. Zu den Voraussetzungen des Verlangens

Die Voraussetzungen für das Verlangen zur Einberufung einer außerordentlichen Hauptversammlung nach § 122 Abs. 1 AktG liegen vor. Die verlangten Tagesordnungspunkte fallen in die Kompetenz der Hauptversammlung. Zum Nachweis des erforderlichen Quorums und der Vorbesitzzeit sowie des Haltens der entsprechenden Aktien bis zur Entscheidung über diesen Antrag im Sinne von § 122 Abs. 1 AktG (hilfsweise § 122 Abs. 2 Satz 1 AktG) verweisen wir auf das Aktienregister (vgl. § 67 Abs. 2 AktG).

Eine ordentliche Hauptversammlung für das Geschäftsjahr 2021 ist derzeit vom Vorstand weder einberufen noch für uns als Aktionär auch nur absehbar. Die Einberufung einer außerordentlichen Hauptversammlung ist daher sachgerecht und auch im Unternehmensinteresse, damit der zu bestellende besondere Vertreter zur

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

BETREFF
**EINBERUFUNGSVERLANGEN**

SEITE
13/13

Geldendmachung der Ersatzansprüche schnellstmöglich seine Tätigkeit aufnimmt, um Schäden auszugleichen und die fortwährende Schädigung durch die Partex zu unterbinden.

Dem Antrag ist damit zu entsprechen und die Einberufung der Hauptversammlung mit den verlangten Tagesordnungspunkten ist unverzüglich bekannt zu machen. Wir weisen der guten Ordnung halber darauf hin, dass dem Vorstand bei der Entscheidung über dieses Einberufungsverlangen kein Ermessen zusteht.

Für die Entscheidung des Vorstands über die Einberufung der Hauptversammlung merken wir uns den **4. November 2022** vor. Sollte eine Einberufung bis dahin nicht erfolgt sein, sehen wir uns veranlasst, eine gerichtliche Ermächtigung im Sinne von § 122 Abs. 3 AktG zu beantragen.

Mit freundlichen Grüßen

Hans-Christian Semmler

- Geschäftsführer -

Convenience Translation

# H C S



HCS - Bockenheimer Landstrasse 2-4 - D-60306 Frankfurt am Main

Innoplexus AG
- Board of Directors -
Frankfurter Straße 27
67650 Eschborn
**E-Mail on advance:**
gunjan.bhardwaj@innoplexus.com
holger.hoffmann@innoplexus.com

DATE
21 OCTOBER 2022

PAGE
1

SENDER                          PHONE NUMBER                MAIL
HANS-CHRISTIAN SEMMLER          +49 173 9019614             INFO@HCS-BETEILIGUNGEN.DE

**Request pursuant to Section 122 (1) of the German Stock Corporation Act (AktG) to convene an extraordinary general meeting of Innoplexus AG, alternatively pursuant to Section 122 (2) AktG to extend the agenda of the next general meeting.**

Dear Sirs,

HCS Beteiligungsgesellschaft mbH ("**HCS**") has been the holder of shares corresponding to more than one-twentieth of the share capital of Innoplexus AG (herinafter refered to as "**Innoplexus**" or the "**Company**") for more than 90 days. This can be inferred from the Company's share register (Section 67 AktG). HCS intends to hold these shares long term, in any case until a legally binding decision is made in any proceedings that might become necessary pursuant to Section 122 (3) AktG and until the end of the general meeting with the following agenda items.

For the sake of good order, we would like to point out that HCS has withdrawn without prejudice the appeal filed against the decision of the Registry Court of 3 August 2022 regarding HCS's request to extend the agenda of 10 February 2022. Merely for reasons of procedural economy, we have decided to submit a new request to convene an extrodinary general meeting with focused motions for resolution which is – according to our continuing opinion in line with the prevailing opinion non-mandatory – and will further detail and specify the company's claims for compensation against Dr Gunjan Bhardwaj and Partex N.V. and hereby also rely on the factual findings of the Special Audit Report of 16 September 2022.

If, in connection with the publication of the agenda items with the invitation, the company deems anonymization to be necessary with regard to data protection, we ask you to timely response in order to coordinate.

HCS hereby requests that an extraordinary general meeting be convened or, alternatively, that the agenda of the next annual general meeting be extended by the following items:

HCS-BETEILIGUNGSGESELLSCHAFT MBH WITH REGISTERED OFFICE IN FRANKFURT/MAIN — WWW.HCS-BETEILIGUNGEN.DE
BOCKENHEIMER LANDSTRASSE 2-4 — D-60306 FRANKFURT/MAIN — LOCAL COURT FRANKFURT/MAIN HRB 56689
UID: DE233741762 — MANAGEMENT BOARD: HANS-CHRISTIAN SEMMLER UND RENATE SEMMLER
BANK DETAILS: IBAN DE84 4584 0026 0660 0795 00 — BIC COBADEFFXXX — COMMERZBANK LÜDENSCHEID

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

## 1. Assertion of claims for damages pursuant to Section 147 (1) AktG

HCS Beteiligungsgesellschaft mbH proposes that the following resolution be adopted:

The general meeting resolves pursuant to Section 147 (1) sentence 1 AktG that Innoplexus AG asserts claims of the Company against Dr Gunjan Bhardwaj pursuant to Section 93 AktG, Section 117 AktG and Section 317 (3) AktG as well as against Partex N.V. with registered office in Amsterdam, Netherlands (hereinafter referred to as "**Partex**", including the former company names Partex Capital UG and Partex Capital GmbH), in particular pursuant to Sections 117, 317 (1) AktG, Section 113 (1) of the German Commercial Code (HGB) analogously – jointly and severally, if applicable – which Innoplexus has incurred as a result of the transfer of business opportunities and core competences as well as areas of the Company developed from these core competences to the controlling company Partex and companies affiliated with it (with the exception of the Company) in connection with the facts briefly outlined below, planned by Dr Gunjan Bhardwaj and Partex in January 2021 at the latest and initiated in May 2021 at the latest:

Among other things, the company operates a self-developed AI-supported platform for the discovery and development of medical substances and drugs that drives innovation in the healthcare sector. This platform constitutes a unique selling point and is to be considered as a competitive advantage.

At the company, experts from various disciplines of software development have developed patentprotected capabilities that include data sourcing, data aggregation, data analysis (including AI) and data visualisation. This set of tools, called CAAV (for **C**rawl, **A**ggregate, **A**nalyze, **V**isualize), enables the company to analyse and harness unstructured and structured private and publicly available data sets (see page 35 et seqq. of the Special Audit Report of Alvarez & Marsal Disputes and Investigations GmbH dated 16 September 2022, hereinafter "**Special Audit Report**"). Through its developments in blockchain technology, the Company is able to orchestrate a secure exchange of the obtained results between any participants. On the basis of these core competences and with the help of experts who have mastered the specific concepts (ontologies), the company develops products and services for various business areas.

The company already presented this connection in 2016 in the presentation "Innoplexus investor summary deck_v4.0.pdf" – here translated into German – as follows.

*"Innoplexus is in the process of transforming the market for data services and analytics as a service with the help of ontologies, artificial intelligence, automation, and other basic technologies. We started our experiment in the life sciences segment with a platform for competitive research (Oilbird™) and the world's first real-time opinion leader discovery and management platform (Touchpoint). (...) We also developed a platform (Clarity) to automate drug performance data by automatically collecting and aggregating data and analysing it in real time. In the financial services segment, we started developing the Regi™ product with our legal language ontology and designed a model for the investment ontology (LEAF). Similarly, we have started to developed a concept for the consumer goods industry. (...) We are the Google of the next generation (...)"*

In the course of the following years, a whole series of other products have been developed or finished, such as:

H C S



- Under the working title "Digital Kosmos Stiftung" (abbreviated "DKS"), Innoplexus intended to establish and operate a marketplace in North Rhine-Westphalia which, on the one hand, would promote an efficient exchange of current research results and, on the other hand, would offer a nucleus for the establishment of companies that could, for example, expand its functionality and create new applications on its basis. The marketplace to be created on the basis of the company's development work amounting to several thousand person-years, a large number of successful patent applications and several years of successful activity in the life science industry should document priority and copyrights in a forgery-proof manner and motivate the exchange of research results via its own currency (token).

- Under the working title "Smart City Service", an offer for redesigning infrastructure (e.g. street lighting) under the aspect of sustainability and cost savings was to be developed together with Deutsche Bank as a financing partner for municipalities.

- Under the working title "Innoplexus` LS AI Fund", Innoplexus offered capital funds the service of evaluating clinical trials of listed pharmaceutical companies based on publicly available information, determining the probability of successful drug approval and preparing investment decisions.

These examples show that it is not only Innoplexus' developed offerings, but the underlying core competencies that represent business opportunities for the company.

In the areas of "Financial Services" (see pages 44 to 46 of the Special Audit Report, presentation "Innoplexus Blockchain Platform – Solution for Payments and Banking" from 2020), the Company has developed various strategies and specifically pursued them. The Company also pursued the corporate strategy of purchasing and in-licensing drug candidates that are in an early stage of development or whose development has been abandoned under a so-called "Asset Equity Partnership Model" ("AEPM") (see page 43 et seq. of the Special Audit Report; presentation with the title "Leveraging AI for Indication prioritisation: Sucess stories of Big Pharme early phase and discounted asses revival" from December 2020, esp. page 11 and 13). In an email to a potential investor, dated 14 February 2021, Dr Gunjan Bhardwaj stated that Innoplexus would soon obtain rights relating to drug candidates from relevant pharmaceutical companies (page 56 of the Special Audit Report). In January 2021, Dr Gunjan Bhardwaj stated in a presentation of Innoplexus ("The world's most advanced AI-powered platform covering the entire research and development value chain") – here translated into German – that "2020 has catapulted Innoplexus into the top league of virtual biotechs with end-to-end AI".

As late as December 2020, in a phase when the company's capital and liquidity situation was critical and further financing uncertain, the company specifically pursued this comprehensive approach as can be seen in a presentation ("Potential Structure of collaboration") on the establishment of an SPV structure with Fresenius and Deloitte, whereby it was already clear from this presentation, which was apparently not taken into account by the special auditor, that Dr Gunjan Bhardwaj was not pursuing an entry of the investor Futury directly into the company, but privately into his investment company Partex N.V. on the basis of a "discount valuation".

During this time, Partex's minority shareholding in the company was Partex's only significant asset (see page 22 of the Special Audit Report). In an email dated 19 June 2017, Dr Gunjan Bhardwaj

H C S



had assured that the Partex incorporation was solely for tax purposes and that the transfer of part of his shares to Partex would not otherwise change anything for the other shareholders. However, with the presentation "Partex Investment Deck" from January 2021 (hereinafter "plan of action"), Dr Gunjan Bhardwaj openly solicited an investor for an investment in Partex instead of Innoplexus. This presentation outlines the plan of action, according to which – in diametric contradiction to Dr Gunjan Bhardwaj's assurance of 19 June 2017 – Partex is to be established as the "new Innoplexus" in the future, and certain business areas developed from Innoplexus' core competences are to be pursued by Partex in the future.

Essential elements of the outlined plan of action after the entry of an investor into Partex were that (1) Partex becomes majority shareholder ">50%" of Innoplexus, that (2) a BioTech Platform (at that time called "CureTec") is set up for the use of AI technology for the further development and monetisation of "failed assets", i.e. pharmaceutical and biotech research projects with unclear prospects of success that have not been completed, which – as the presentation also shows – is a business area developed by Innoplexus, that (3) a "Hedge Fund Life Sciences" is set up and that (4) a DeepTech Blockchain Subco is set up, for which Partex intended to poach a team from Innoplexus in Germany and India in the field of Blockchain ("High performance lean team to be taken over in Germany and India with expertise in both Public and Private Blockchain and distributed ledger technologies") and will develop Blockchain competencies, including the development of a "Hyperledger Fabric Blockchain" with capacities for more than 2.3 billion transactions for an "asian payments regulator". All these future areas highlighted in the Partex Investment Deck presentation for Partex are based on Innoplexus' core competencies. The areas of acquisition and the development of drug candidates and financial services developed by Innoplexus with its core competencies were assigned to Partex.

On this basis, the investor Francisco Fernandez then invested in Partex via investment companies. Part of the money invested in Partex then flowed to Innoplexus via a capital increase resolved on 8 March 2021 and was used to acquire further shares, so that Partex acquired a majority stake in Innoplexus at the end of March 2021 (see page 19 et seq. of the Special Audit Report). Other parts of the capital were used to build structures in order to pursue the core competencies of Innoplexus shown in the presentation on its own account in the future.

Although Dr Gunjan Bhardwaj was obliged to devote all his labour and attention to the Company pursuant to Section 20 (1) of the Shareholders´Agreement (Shareholders` Agreement relating to Innoplexus AG dated 25 March 2019 as well as 8 March 2021) existing between all shareholders and the Company, he continued to implement the plan of action set out in Partex` presentation from January 2021 step by step for Partex after the capital increase. Partex established the subsidiaries CureTeq AG with the sub-subsidiary Oncoteq AG and Perpetual Block AG with the sub-subsidiary PerpetualBlock Technologies Pvt. Ltd. in the second quarter of 2021 (see page 22 et seq. of the Special Audit Report). The findings of the Special Audit Report prove that Dr Gunjan Bhardwaj violated Section 20 (1) of the Shareholders' Agreement. The Special Audit Report further shows that – as provided for in the written plan of action – numerous employees of Innoplexus changed to Partex or companies affiliated with it (see pages 45, 46, 68, 75 of the Special Audit Report).

The Special Audit Report states that the company has undergone a realignment since 26 May 2021, as the two business areas Financial Services and the further development of in-licensed drug candidates within the framework of AEPM were no longer named as core business areas by the

# H C S



management board in the supervisory board meeting. However, neither were business areas to be discontinued named, nor was a discontinuation of business areas expressly decided by the supervisory board (see pages 44, 46 and page 58 of the Special Audit Report). The de facto discontinuation of these two areas by the management board took place at the instigation of Partex, because the corresponding expectation of Partex is readily apparent from the plan of action, which was in any case known to management board member Dr Gunjan Bhardwaj on the part of the company. As far as the company nevertheless continued to act in the market (see pages 54, 58 of the Special Audit Report), this was done in matters that were later left to Partex.

Dr Gunjan Bhardwaj and Partex used their influence on the management board of Innoplexus and caused the management board not to secure independent financing for the implementation of the business opportunities at company level. Also, according to the findings of the Special Audit Report, start-up companies such as Innoplexus usually rely on external funding from capital providers (see page 18 footnote 3 of the Special Audit Report). However, Dr Gunjan Bhardwaj only secured the financing of his private investment company Partex, but not the direct sufficient financing of Innoplexus. This financing of Partex for the purpose of building up its own operational business fields beyond the mere holding of the shareholding in Innoplexus contradicts the expressly representations made by Dr Gunjan Bhardwaj to shareholders on 19 June 2017. Dr Gunjan Bhardwaj has not used the opportunities available to the Company to raise external funds in his capacity as a director of the Company. Neither has he

- took up an offer from APEIRON to fund drug development via an SPV from Innoplexus, nor

- pursued APEIRON's offer to organise a SPAC merger nor

- pursued the possibility of implementing a capital increase, which the management board had announced as realistic in January 2021, be it in the amount of EUR 30 million with investors (Bill Yuan/Simone Giamocelli), with whom it had been negotiating promisingly for months, or through the inclusion of Roivant as a majority shareholder, nor

- approached the potent shareholders HCS Beteiligungsgesellschaft mbH, Finlab and Leon Amram about SPV financing for drug development, nor

- taken up and negotiated the offer of HCS Beteiligungsgesellschaft mbH to purchase the Curia project, nor

- sold the divisions no longer designated as value drivers by the management board (with or without prior independence), although these have a market value – as evidenced by the founding and financing of Perpetual Block AG and CureTeq AG by Partex.

Dr Gunjan Bhardwaj wrote in his presentation "Innoplex_2021_Plan_Confidential_GB_V1.3.pptx" used for Mr Christian Angermayer, "Jeffries suggests Innoplexus an 'ideal' deal for SPACs", amongst other things. In the same presentation, Dr Gunjan Bhardwaj pointed out other funding opportunities that he believes exist.

As can be seen from the findings in the Special Audit Report on the financial circumstances of the company (see page 76 of the Special Audit Report), further financing to pursue the two core

H C S



BETEILIGUNGSGESELLSCHAFT
MBH

competencies was not implemented. On the contrary, the Special Audit Report shows that in connection with the acquisition of the medical substance M8891 pursued by Innoplexus, there was no written documentation that the company also approached other potential investors, as Dr Gunjan Bhardwaj initially claimed to the special auditor (page 56 of the Special Audit Report). Further capital measures at the company, in which the existing shareholders or new investors further strengthen the capital base, were no longer prepared by the management board member Dr Gunjan Bhardwaj.

The fact that financing for Innoplexus would have been feasible with the honest efforts of the board member Dr Gunjan Bhardwaj is already shown by the fact that Dr Gunjan Bhardwaj succeeded in finding an investor for Partex for an empty shell (apart from the minority share in the company), although the company's future use of Innoplexus' core competencies was not legally secured for Partex at all.

As a result of these initiations, Innoplexus has suffered the disadvantage of no longer being able to use the developed core competences with the full profit potential itself. The access of Partex to the core competences of Innoplexus for the development of own operative activities in this area via the newly founded subsidiaries and sub-subsidiaries took place free of charge.

The agreements referred to in the resolution on the appointment of the special auditor adopted at the general meeting on 16 May 2022 do not change the disadvantages caused to the company by Partex and Dr Gunjan Bhardwaj. In the present case, one company (Innoplexus) first granted another company (Partex) extensive access to the premises and employees of its own company as well as to the know-how of the company's board of directors (Dr Gunjan Bhardwaj) so that this third party company could select the areas in which it wished to do business itself in the future. Subsequently, only service contracts were concluded with Innoplexus, although extensive use is made of Innoplexus' strategies and know-how. Real third-party companies, in which Dr Gunjan Bhardwaj is neither CEO nor significantly involved, are naturally not open to such an approach at all. In this case, the management board of the company, Dr Gunjan Bhardwaj, gave his investment company Partex access to know-how, employees, business partners and contacts, as one would never naturally and reasonably do to a third party. The subsequent conclusion of contracts concealing this cannot eliminate the breach of duty and the constellation, which is inherently subject to a permanent conflict of interest and is not even accessible to a third party comparison.

Furthermore, the special auditor stated in the Special Audit Report that contracts were concluded and backdated and that services were rendered even before the backdated validity of contracts, in some cases even without a non-disclosure agreement (see for example pages 55, 56, 90, 97, 99 and 112 of the Special Audit Report). In these cases, disadvantages to the company have thus been established.

The Special Audit Report also reveals that the company initially wanted to secure the Failed Clinical Asset M8891, which was brought to the company's attention in April 2021, itself via a special purpose entity yet to be established, but was then taken over by CureTeq AG at the instigation of Dr Gunjan Bhardwaj and Partex and then licensed in (page 54 et seqq. of the Special Audit Report). The disadvantage for Innoplexus is that the full profit potential is realised at CureTeq AG, while Innoplexus is only to receive limited remuneration (see page 85 et seq. of the Special Audit Report) under the service agreement.



The tests and negotiations started by Innoplexus on the two medical substances OX40 and NI-1401 have meanwhile also been taken over by CureTeq AG for its own account (page 56 et seq. of the Special Audit Report).

Partex's sub-subsidiary, PerpetualBlock Technologies Pvt. Ltd., according to the findings of the Special Audit Report, carries out valuations of alternative assets for third parties (Alternate Assets - Valuation). These assets can be anything, such as supercars, art or music (page 70 of the Special Audit Report). The technology developed by Innoplexus is thus also used in the Partex Group to provide financial services for its own account. According to the management of PerpetualBlock Technologies Pvt. Ltd., a framework and service agreement concluded between Innoplexus Consulting Services Pvt. Ltd. and PerpetualBlock Technologies Pvt. Ltd. at the instigation of Dr Gunjan Bhardwaj and Partex was concluded for "training purposes" in order to "adapt Innoplexus' technologies for its own account for other fields of application" (page 71 of the Special Audit Report). The enabled adaptation of Innoplexus' core competence to other fields by Partex group companies is regardless of a lack of consideration detrimental to Innoplexus.

The Special Audit Report identifies complex relationships and activities between the company and Partex and its subsidiaries. The company's submission in an action for disclosure of information before the Regional Court of Frankfurt am Main (file no. 3-05 0 63/22) shows that the company had not implemented a disadvantage recording system at least until the date of the extraordinary general meeting on 16 May 2022. The Special Audit Report also states that the company does not prepare a dependency report (page 16 of the Special Audit Report).

All claims falling within the scope of Section 147 (1) of the AktG shall be asserted against Dr Gunjan Bhardwaj and Partex.

The assertion of claims against Dr Gunjan Bhardwaj and Partex includes all damages arising from the facts outlined above, the amount of which may be specified by asserting claims for disclosure of information and obtaining expert opinions.

However, the assertion of the claims against Partex also covers the elimination of the ongoing damage to Innoplexus by Partex and its group companies through the use of core competences of Innoplexus and areas developed therefrom and for new fields of application for its own account and the enforcement of a non-compete obligation of the majority shareholder Partex and its group companies arising from the duty of loyalty, which newly and for the first time entered into competition in the areas developed by Innoplexus and with the core competences developed by Innoplexus after the majority takeover in March 2021 by developing its own operating activities via group companies on the basis of the written plan of action.

## 2. Appointment of a special representative pursuant to Section 147 (2) sentence 1 AktG

HCS Beteiligungsgesellschaft mbH proposes that the following resolution be adopted:

The general meeting appoints Mr. Stefan Behrendt, lawyer, Telemannstr. 1, 95444 Bayreuth, as special representative pursuant to Section 147 (2) sentence 1 of the AktG to enforce the claims for damages described above under agenda item 1. The special representative may engage suitable auxiliary persons for the assertion of the claims for damages and obtain advice and support, in particular legal and technical/economic advice and support. In particular, the special representative



H C S

shall be authorised to negotiate the contractual relationship with the auxiliary persons and advisors on behalf of Innoplexus AG at customary conditions and to conclude it in a legally binding manner.

Claims for compensation shall not only be limited to monetary damages, but the special representative is also authorised to assert claims for in rem restitution or claims for the prevention of a continuing injury. The special representative is also authorised to assert claims for compensation, if necessary, in adhesion proceedings pursuant to Sections 403 et seq. of the Code of Criminal Procedure (StPO). Also, expressly covered by the authorisation are ancillary claims regarding the disclosure of information, the rendering of accounts and, if applicable, the determination of the obligation to pay damages, insofar as damages cannot yet be conclusively assessed.

The special representative shall have the power to carry out a legal and/or factual examination of the claims for compensation himself.

### 3. Appointment of a special auditor in accordance with Section 142 (1) of the AktG

HCS Beteiligungsgesellschaft mbH proposes that the following resolution be adopted:

The general meeting appoints Mr. Wolfgang Jahn, lawyer, Milanring 11, 14558 Nuthetal, as special auditor. He may call upon suitable auxiliary persons for the audit.

The special audit pursuant to Section 142 (1) of the AktG has as its object the management transactions listed below and serves to uncover breaches of duty and violations of stock corporation and group law by members of the management board and supervisory board of Innoplexus AG:

1) Did deletions, manipulations and suppression of evidence occur following the letter of HCS Beteiligungsgesellschaft mbH of 6 February 2022, the e-mail of 7 February 2022 to the then members of the supervisory board with the subject "Innoplexus – Document retention and preservation" and the request for additions to the agenda until the conclusion of the special audit resolved at the extraordinary general meeting on 16 May 2022?

2) Did members of the supervisory board, excluding the then supervisory board member Hans-Christian Semmler, communicate with members of the management board, including Dr Gunjan Bhardwaj, as the addressee of the allegations made by HCS Beteiligungsgesellschaft mbH, about the content of and how to deal with these allegations prior to the management board's receipt of HCS Beteiligungsgesellschaft mbH's request to convene a general meeting on 10 February 2022?

3) At what point did advisors to the management board and supervisory board involved in the dispute between the Company and HCS Beteiligungsgesellschaft mbH, had knowledge of (1) the subsequent creation and backdating of documents as stated in the Special Audit Report of 16 September 2022, (2) the fact that no dependency report is prepared at the Company, (3) the presentation by Dr Gunjan Bhardwaj from January 2021 entitled "Partex Investment Deck", (4) services provided by the Company to group companies of Partex N.V. without a contractual basis, (5) incomplete or refused information to the Special Auditor appointed at the extraordinary general meeting on 16 May 2022, and what

H C S



consequences did the management board and supervisory board draw in each case from any knowledge of the consultants for the cooperation?

4) Was there any coordination or collusion between members of the management board and the supervisory board or their advisors on the one hand and members of the executive bodies of Partex N.V. or their advisors on the other hand in connection with (1) the allegations made by HCS Beteiligungsgesellschaft mbH in the agenda extension request of 10 February 2022 and (2) the preparation and conduct of the extraordinary general meeting of 16 May 2022 (3) proceedings conducted by HCS Beteiligungsgesellschaft mbH or letters relating thereto, and (4) the preparation and monitoring of the special audit resolved in the extraordinary general meeting of 16 May 2022?

In order to clarify the aforementioned subjects of the audit, the special auditor shall be authorised, at its own discretion, to question persons and to have access to all documents (also in electronic form) of Innoplexus AG and its affiliated companies, in particular to documentation of the meetings of the management board and supervisory board, correspondence (also in electronic form) between bodies, members and employees of the company as well as correspondence (also in electronic form) between the company and its legal advisors and other consultants, including all statements and expert opinions. The special audit also expressly refers to whether and to what extent documents (including electronic documents) in connection with the above audit subjects were subsequently changed or eliminated or whether there were instructions to do so.

**Reasoning:**

The purpose of this request results from the above-mentioned resolution items and the corresponding resolution proposals. The prompt referral of the matter to the general meeting is necessary in order to avert further damage to the company.

### I. Regarding agenda items 1 and 2

The facts are presented in detail in the proposed resolution. We refer once again to the public statements mentioned in the request to extend the agenda of 10 February 2022. In September 2021, Dr Gunjan Bhardwaj and Mr Francisco Fernandez demonstrably made no secret of the fact that they are active with Partex in the business areas of the company's business opportunities.

Dr Gunjan Bhardwaj also confirms in public statements that for him Partex N.V. now has the importance that Innoplexus used to have, transferring his vision from Innoplexus AG to Partex without further ado.

Still in 2019, Bhardwaj's vision was profiled by the Neue Züricher Zeitung:

> „*Shocked by his friend's illness, Bhardwaj searched for information about his friend's tumour, about specialists and therapies. He found that answers to such questions were hard to find on the internet, he says. The relevant knowledge is growing rapidly, he says, and it is difficult to filter out relevant and high-quality data from the overabundance and to recognise cross-connections between scattered information. When he discussed this with his father, he advised: "Don't complain, act!". And so Bhardwaj set to work together with some fellow students. After four years of tinkering, they founded Innoplexus AG at the end of 2015. Their business idea is to use self-developed artificial intelligence (AI) and machine learning to search for data in the field of life sciences, to structure it, to*

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

> *bring it into a logical context and to make it available to paying users through licences and partnerships*".   (Source:   https://www.nzz.ch/wirtschaft/innoplexus-gruender-bhardwaj-will-ki-gegen-krebs-einsetzen-nzz-ld.1523063)

Dr Bhardwaj has since rewritten his story. He said in an English-language interview with the Indian business and financial news channel ET Now:

> "*When my first boss and a very good friend was diagnosed with a life-threatening illness, I saw hopelessness looking straight into my eyes for the first time. And that is what triggered the creation of Partex. The world's first digital pharmaceutical company that we are continuously building to improve the longevity and health of humanity*. (Source: https://www.youtube.com/watch?v=fnJ8v82D0kI; translation by HCS).

This representation is downright absurd because the foundation of Partex was originally only for tax reasons as a holding company and, moreover, significantly later than the foundation of Innoplexus took place. The new storytelling, however, shows that Dr Gunjan Bhardwaj now considers Partex to be the "new Innoplexus", after core competencies and business areas developed by Innoplexus were transferred to Partex.

There are therefore comprehensive claims for compensation:

These are firstly claims for damages due to breaches of duty by the chairman of the management board, Dr Gunjan Bhardwaj, in accordance with Section 93 AktG.

These are, also, claims under Section 117 AktG against Partex and Dr Gunjan Bhardwaj.

In addition, there are, in particular, claims under group law pursuant to Section 317 (1) AktG, which are directed against the controlling company Partex, as well as pursuant to Section 317 (3) AktG against the board member Dr Gunjan Bhardwaj. The diversion of business opportunities from the dependent company to the controlling company or another group company constitutes, just like the access to intellectual property rights of the dependent company by the controlling company within the meaning of Section 311 AktG, a disadvantageous other measure for the company (see Habersack, in: Emmerich/Habersack, Aktien- und GmbH-Konzernrecht, 8th ed, Section 311 marginal no. 51 with further references), if the disadvantages – as in the present case – were not compensated for during the financial year or a compensation for disadvantages was specifically determined by the end of the financial year at the latest. We refer to the fact that the inducements for the de facto abandonment of business areas and the omitted financing efforts at the level of the company as well as the shift of the concrete business opportunity with regard to the medical substance M8891 and other specific disadvantages are presumed due to the existing dual mandate of Dr Gunjan Bhardwaj as member of the managing board of the dependent company and member of the managing board of the controlling company (see Altmeppen, in: Münchener Kommentar AktG, 6th ed., Section 311 marginal no. 87 et seqq.)

Apart from this, an activity of the controlling company Partex and its group companies in competition with Innoplexus is illegal per se, since as a manifestation of the duty of loyalty there is a prohibition of competition of the major shareholder in the case of non-listed stock corporations in accordance with Section 113 (1) HGB (see Habersack, in: Emmerich/Habersack, Aktien- und GmbH-Konzertrecht, 8th ed, before Section 311 marginal no. 51, marginal no. 7 with further references. The factual particularities of the decision of the BGH of 25 June 2008 - II ZR 133/07 – are not present here, since Partex N.V. with subsidiaries only subsequently entered into competition with the company).

# H C S



BETEILIGUNGSGESELLSCHAFT
MBH

## II. Regarding agenda item 3

As can be seen from agenda item 1, Dr Gunjan Bhardwaj and Partex have caused and continue to cause great harm to the Company through consistent and reckless implementation of their plan of action documented in the Partex Investment Deck presentation of January 2021. Against this background, the management board and the supervisory board and their advisors must exclusively represent the interests of the Company without any consideration for the private interests of the wrongdoers Dr Gunjan Bhardwaj and Partex. Against this background, the determination by a special auditor of when advisors received knowledge of relevant information and to what extent there was coordination and cooperation with the damaging parties and their advisors is relevant for the assessment of the dutifulness of the actions of the board members as clients of the advisors and for questions of recourse.

## III. On the prerequisites of the request

The requirements for convening an extraordinary general meeting pursuant to Section 122 (1) AktG are met. The requested agenda items fall within the competence of the general meeting. For proof of the required quorum and the previous holding period as well as the holding of the respective shares until the decision on this request in terms of Section 122 (1) AktG (alternatively Section 122 (2) sentence 1 AktG), we refer to the share register (see Section 67 (2) AktG).

An annual general meeting for the 2021 financial year has currently neither been convened by the management board nor is it even foreseeable for us as shareholders. Convening an extraordinary general meeting is therefore appropriate and also in the company's interest, so that the special representative to be appointed to recover the compensation claims starts his activities as soon as possible in order to compensate for damages and to stop the party from continuing to cause damage.

The request is thus to be complied with and the convening of the general meeting with the requested agenda items is to be announced without delay. For the sake of good order, we would like to point out that the management board has no discretion in deciding on this request to convene the general meeting.

We note 4 November 2022 as the date for the management board's decision on convening the general meeting. If the general meeting has not been convened by then, we will have to apply for a court authorisation in accordance with Section 122 (3) AktG.

With kind regards

Hans-Christian Semmler

– Managing Director –