UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re Application of<br><br>HCS Beteiligungsgesellschaft mbH,<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding | Civil Action No. 3:22-MC-00101-M |

**DECLARATION OF CARSTEN VAN DE SANDE IN OPPOSITION
TO APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782
TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

I, Carsten van de Sande, hereby declare under penalty of perjury of the laws of the United States of America that the following is true and correct:

1. I am a partner at the law firm of Hengeler Mueller in Frankfurt am Main, Germany. I am licensed to practice law in Germany. Hengeler Mueller is counsel for Partex N.V. ("Partex") in connection with the dispute discussed below, and I am the lead partner for that engagement.

2. I submit this declaration in opposition to the application of HCS Beteiligungsgesellschaft mbH ("HCS") for an order pursuant to 28 U.S.C. § 1782 to conduct discovery for use in a foreign proceeding.

A.  <u>Innoplexus AG</u>

3. Innoplexus AG ("Innoplexus") was incorporated in 2016 for the purpose of expanding a start up venture that had been founded earlier by Dr. Gunjan Bhardwaj and a colleague. Innoplexus develops and patents software tools, based on artificial intelligence and

machine learning, that can be used to analyze large volumes of information about drugs and medical devices that are undergoing clinical trials as part of the pipeline that brings new drugs to market. These tools can be used, *inter alia*, to forecast a clinical trial's prospect of success. Pharmaceutical companies, and investors in the pharmaceutical space, can use this information to make decisions about, for example, how to optimise the costs of developing new medicines, treatments and medical devices.

4. Innoplexus is the brainchild and lifetime achievement of Dr. Gunjan Bhardwaj, who has held substantial percentages of shares in the company at all relevant times, either directly or through his company Partex. Partex and Dr. Gunjan Bhardwaj together currently hold about 81 % of the shares in Innoplexus.

5. Innoplexus' business model has always been to act as a service provider to pharmaceutical companies and other players in the pharmaceutical industry. The company charges fees or royalties for providing analysis that can be used by those companies in developing drugs and medical devices and in making related business decisions. Thus Innoplexus has not itself entered, or had the financial means and other resources required to enter, the business of developing drugs or making direct investments in pharmaceutical companies, which would entail high costs and risk, and which have properly been viewed as separate functions that are not necessarily compatible with its function as a provider of services to such companies.

6. HCS is a pure financial investor that invested in Innoplexus in 2016. HCS currently holds about 17% of the share capital and voting rights in Innoplexus. Hans-Christian Semmler is a managing director of HCS. As a company formed under the laws of Germany, Innoplexus has a dual board of director's structure, with separate supervisory and management

boards. Until February 2022, Hans-Christian Semmler served on the supervisory board of Innoplexus.

7. From 2016 until 2019, HCS participated in various rounds of investment in Innoplexus on very favorable terms. During this period, the relationship between HCS and Dr. Gunjan Bhardwaj was generally positive. Thereafter, the relationship began to deteriorate.

B. The Series D Funding: HCS' Takeover Attempt

8. In January 2021, Innoplexus solicited investments in its Series D funding round to raise the funds needed for the company's further development and growth.

9. HCS sought to bring in an allied investor with a proposed investment under terms that would have given HCS and the new investor a controlling stake in Innoplexus. It became clear during the course of negotiations that HCS and the new investor would have used their resulting control to (i) remove Dr. Gunjan Bhardwaj from his positions with Innoplexus, and (ii) change Innoplexus's business so that the company would engage in drug or medical device development and/or make direct investments in companies engaged in drug or medical device development.

10. HCS' attempt to take over Innoplexus and remove Dr. Gunjan Bhardwaj did not succeed. Dr. Gunjan Bhardwaj raised sufficient funds from another investor (Francisco Fernandez), and on better terms, so that Partex could increase its holdings to 73.28 %. HCS is not correct when it alleges that Francisco Fernandez had ever been solicited to, or had considered, investing directly in Innoplexus. After this funding round, HCS continued to hold a 17% stake in Innoplexus, and Hans-Christian Semmler continued to be a member of Innoplexus' supervisory board.

11. It is notable that the recapitalization of Innoplexus in connection with the Series D funding round, which HCS now characterizes as a "takeover", was conducted in a manner that was fully in accordance with Innoplexus' governing documents and German corporate governance law. Although not pleased with the outcome, Hans-Christian Semmler and HCS brought no legal challenge to the results of the Series D funding round.

    C.    <u>HCS' Campaign of Harassment</u>

12. Since shortly after the Series D funding round, HCS and Hans-Christian Semmler have been in a constant state of hostility to Dr. Gunjan Bhardwaj, the other members of the Innoplexus boards, and Partex. HCS has engaged in a constant campaign of obstructionism and harassment, of which the present proceeding is just the latest front.

13. By February 2022, HCS began making the accusations against Dr. Gunjan Bhardwaj, Partex, and the boards of Innoplexus that form the basis of the application before this Court, i.e. that (i) Dr. Gunjan Bhardwaj had transferred assets or business opportunities "worth billions" to Partex and Dr. Gunjan Bhardwaj, (ii) Dr. Gunjan Bhardwaj and Partex are wrongly competing with Innoplexus, and (iii) the supervisory and management boards of Innoplexus have breached their duties by either facilitating or failing to prevent such alleged wrongdoing.

14. From February 2022 to the present, HCS and its representatives have continued to make these accusations in remarks made by Hans-Christian Semmler at board meetings and in a stream of letters to the boards and their advisors and to Innoplexus shareholders, claiming to have a plethora of evidence for the allegations. Hans-Christian Semmler and HCS have repeatedly been asked to provide details or substantiation for their allegations, which they have failed to do. Meanwhile, even though HCS has not provided any evidence to support its allegations, at the initiative of Partex the special audit described below was commissioned to

investigate into HCS' accusations. These efforts have also failed to find substantiation for HCS' accusations.

### D.   First Proceedings in the Frankfurt Local Court

15.   Disappointed by the fact that the management and supervisory boards of Innoplexus had declined to bring action against Dr. Gunjan Bhardwaj and Partex for the harms they had supposedly caused to Innoplexus, in February 2022, HCS commenced proceedings under provisions of German law that allow a minority shareholder to petition for the power to appoint a special representative to pursue claims on behalf of the company. HCS sought an order that would have allowed it to convene an extraordinary general meeting of Innoplexus and pass a resolution appointing a special representative to pursue claims on behalf of Innoplexus against Dr. Gunjan Bhardwaj (the "First Convocation Proceedings").

16.   Ruling on HCS' application in the First Convocation Proceedings, the Local Court (*Amtsgericht*) Frankfurt am Main (the "Frankfurt Local Court") found that HCS had not provided details or substantiation for its allegations against Dr. Gunjan Bhardwaj and Partex. In its submissions to the court, HCS had, *inter alia*, failed to identify any specific business opportunity Partex had taken from Innoplexus. Thus the Frankfurt Local Court concluded that HCS's application did not satisfy the legal requirements because HCS had failed to present sufficiently specific facts as a basis for the alleged claims:

> The application is unfounded, however, since the claim for compensation to be asserted by the special representative to be appointed is not sufficiently specific. Contrary to the opinion of the petitioner [HCS], the facts are not sufficiently clearly and concretely described and individualized by the petitioner. The petitioner seeks the assertion of claims for damages on account of the alleged unlawful transfer of business opportunities of the Company [Innoplexus] starting March 2021 and violations of existing prohibitions on competition, without stating in an even rudimentary individualized specific manner which specific business activities are concerned. [...] Insofar as the petitioner refers without further explanation solely to the transfer of business opportunities of the

respondent in two concretely described business fields to the other party involved [Partex] or to companies affiliated with it, the facts are not sufficiently specific, even if the respondents [Dr. Gunjan Bhardwaj and Partex] can be sufficiently inferred from the proposed resolution. The 'relocation of business opportunities of the respondent' without any concretization of these business opportunities and presentation of specific actions by the respondent [Innoplexus] does not sufficiently determine the possible claim for compensation.

17. Accordingly, the Frankfurt Local Court dismissed the application by judgment of August 3, 2022. The judgment has become final and binding.

E. The Special Audit

18. In a further effort to address and respond to the accusations made by HCS, an extraordinary general meeting of Innoplexus resolved on May 16, 2022, at the request of Partex, to appoint Alvarez & Marsal Disputes and Investigations GmbH ("Alvarez & Marsal"), a renowned and experienced forensic services firm, as "special auditor" with broad instructions to investigate the allegations made by HCS.

19. The special audit lasted four months and cost Innoplexus around EUR 700,000. It began on May 17, 2022 and concluded on September 16, 2016 when Alvarez & Marsal issued their report on the special audit (the "Special Audit Report"). During that time, Alvarez & Marsal reviewed a total of more than 250 documents which were made available in a data room prepared by Innoplexus. HCS had the opportunity to submit evidence for review, but provided just nine, barely relevant documents.

20. In connection with the special audit, both Innoplexus and Partex allowed searches of numerous email inboxes, although they were not legally obliged to do so. Hans-Christian Semmler, on the other hand, refused the access to his email inbox requested by Alvarez & Marsal. The representatives of Innoplexus and Partex made themselves available repeatedly to provide information to the special auditor. In addition to the documents - mainly provided by

Innoplexus and Partex - numerous discussions were held with more than eleven employees of Innoplexus, Partex and Partex' subsidiaries, two auditors, and the members of Innoplexus' management board.

21. The result of the special audit was that Alvarez & Marsal did not identify any transfer of business opportunities from Innoplexus to Partex or its subsidiaries. The special auditor was not able to establish any facts which indicate that such a transfer of business opportunities took place.

22. Nor was the special auditor able to identify any transfer of actual assets from Innoplexus to Partex without adequate consideration. In the Special Audit Report, Alvarez & Marsal states:

> No facts other than those described above have come to our attention that would suggest any divestment of intangible property rights, know-how or other assets of [IAG] to [PNV], HCS or a company affiliated with either of these two companies or a shareholder – directly or indirectly via a related legal entity or natural person – in the period prior to the date of the extraordinary General Meeting of IAG on 16 May 2022 that is not related to the performance of the contracts mentioned above under audit subject I and for which there is no other contractual basis negotiated at arm's length or adequate consideration either.

23. Therefore, the special auditor could not confirm any of the allegations made by HCS. Rather, HCS' allegations were exposed for what they are: untenable speculation without any basis in fact.

24. I note that, as a shareholder of Innoplexus, Partex has received a copy of the Special Audit Report and is not restricted by German confidentiality laws from disclosing its contents.

F.     <u>HCS' Abuse of the Right to Ask Questions at a Meeting</u>

25.     At Innoplexus' general meeting of May 16, 2022, HCS asked more than 100 questions. To a large extent, these questions concerned the relations between Innoplexus and Partex, to which HCS' accusations relate. Innoplexus' management board answered all of HCS' questions. Nevertheless, on May 30, 2022 HCS filed an application against Innoplexus with the Regional Court (*Landgericht*) Frankfurt am Main (the "Frankfurt Regional Court") pursuant to Sec. 132 of the German Stock Corporation Act (Aktiengesetz – "AktG"). Under Sec. 132 AktG, a shareholder who was not provided with information to which it was entitled at the general meeting may apply for an order directing that the information be provided.

26.     On February 28, 2023, the Frankfurt Regional Court dismissed HCS' application, finding *inter alia* that the subjects of the question that were subject matter of HCS' application had been dealt with exhaustively in the Special Audit Report.

G.     <u>HCS' Renewed Application</u>

27.     Notwithstanding the comprehensive refutation of HCS' accusations in the Special Audit Report, HCS has continued its campaign of obstruction and harassment through an ongoing letter writing campaign as well as through further court proceedings.

28.     On November 9, 2022, HCS filed yet another application with the Frankfurt Local Court, directed at authorizing HCS to convene an extraordinary shareholders' meeting of Innoplexus for the purpose of adopting a resolution to appoint a special representative (the "Second Convocation Proceedings").

29.     Although HCS has so far been unable to present any evidence for its allegations and the Special Audit Report has refuted those allegations, HCS bases its renewed request essentially on the same allegations as in its earlier application to appoint a special representative,

8

i.e. that business opportunities were transferred from Innoplexus to Partex or its subsidiaries. But HCS has once again failed to particularize or substantiate its accusations.

30. The documents submitted as Exhibit 5 to Olaf Gierke's declaration relate to HCS' Second Convocation Proceedings. In the Second Convocation Proceedings, Innoplexus and Partex have argued that HCS' pleadings (again) do not meet the burden of identifying *sufficiently specific facts* from which the claims to be asserted by the special representative result. They have further argued that the Second Convocation Petition must fail because the special audit carried out by Alvarez & Marsal at the initiative of Partex has refuted HCS' allegations regarding "asset stripping" or unlawfully exploiting business opportunities of Innoplexus and that, accordingly, there are no claims which a special representative could assert on behalf of Innoplexus.

31. In the wake of the Special Audit Report finding no basis for HCS' allegations, it is impossible to attribute good faith to their continued obstruction, letter writing, and multiplying of court proceedings.

32. A hearing on HCS' (renewed) motion in the Second Convocation Proceedings will take place before the Frankfurt Local Court on March 21, 2023. We expect the court to issue its judgment soon thereafter.

H.   HCS' Proposed Actions in Germany

33. I note that in its application under Section 1782, HCS stated that it would commence two actions against Partex and Dr. Gunjan Bhardwaj in January 2023. So far as we are aware, no such actions have been commenced. We would have expected the statements of claim for such actions to have been served by now.

34. HCS may have failed to bring such actions because, as explained above, its claims are completely unsubstantiated. In addition, such proceedings would be aimed at obtaining relief that has already been denied by a German court.

35. As described in Olaf Gierke's declaration, in the German proceedings HCS would (i) acting on behalf of Innoplexus, claim damages from Partex and Dr. Gunjan Bhardwaj on behalf of Innoplexus in connection with the alleged "asset stripping" (the "Innoplexus Proceeding"), and acting in its own name and for its own account, claim damages from Partex and Dr. Gunjan in connection with, *inter alia*, an alleged violation by Dr. Gunjan Bhardwaj of his supposed obligation under the shareholders agreement which HCS, Partex and Dr. Gunjan Bhardwaj are parties to (the "Shareholders' Agreement" respectively the "Partex Proceeding").

    1.    <u>The Innoplexus Proceeding</u>

36. As regards the Innoplexus Proceeding, the claims HCS purportedly intends to assert on behalf of Innoplexus are based on various provisions of the German Stock Corporation Act under which, *inter alia*,

> an enterprise (*herrschendes Unternehmen* – the "Controlling Enterprise") that has a controlling influence over a German stock corporation (*beherrschtes Unternehmen* – the "Controlled Enterprise") must adequately compensate the Controlled Enterprise for disadvantageous transactions or disadvantageous measures caused by the Controlling Enterprise (sec. 311, 317 AktG),

> a party who intentionally uses its influence on a German stock corporation to cause, inter alia, a member of its management board or supervisory board to act to the detriment of the corporation or its shareholders must compensate the damage incurred by the corporation as a result thereof (sec. 117 AktG).

37. According to Olaf Gierke's declaration, HCS intends to assert the aforementioned claims in the Innoplexus Proceeding by way of a derivative action, i.e. an action in which HCS would act on behalf of Innoplexus. HCS has sought multiple times (namely in the First and Second Convocation Proceedings), but has so far failed, to achieve the same goal – i.e. to have

the purported claims under secs. 311, 317 and 117 AktG asserted on behalf of Innoplexus – through different means available to minority shareholders under German corporate law.

38. As described in detail above, the court held in the First Convocation Proceedings that HCS had not met the – rather low – burden of pleading sufficiently specific facts that, if they were true, would give rise to the claims HCS alleges Innoplexus has against Partex and Dr. Gunjan Bhardwaj.

39. Contrary to Olaf Gierke's declaration, the presumptive reason why HCS purports to be contemplating the Innoplexus Proceeding is not that convocation proceedings "usually [take] time" (para. 32), but that HCS failed in the First Convocation Proceedings to persuade the court that it had a case that would warrant the appointment of a special representative, and likely expects to fail again in the Second Convocation Proceedings.

40. The Innoplexus Proceeding (including HCS' application seeking an order under 28 U.S.C. § 1782 – the "Discovery Request") are, thus, an attempt by HCS to achieve a goal – the ability to have certain purported damage claims asserted on behalf of Innoplexus – which HCS' has already been denied once by a German court and will soon likely be denied a second time.

41. According to Olaf Gierke's declaration, the Innoplexus Proceeding would be brought under the same provisions of the German Stock Corporation Act, would relate to the same (unsubstantiated) fact patterns, and would be aimed at the same relief as the proceedings HCS wanted a special representative to bring against Partex and Dr. Gunjan Bhardwaj (had a special representative been appointed).

42. In order to be able to initiate the Innoplexus Proceeding, HCS would have to petition the competent court to authorize it to sue on behalf of Innoplexus (sec. 148 para. 1

AktG). A court will grant a minority shareholder authority to sue on behalf of the stock corporation if the shareholder demonstrates, among other prerequisites, that

> actual facts justify the suspicion that the corporation has suffered a damage through dishonesty or gross violation of the law or the articles of incorporation, and

> there are no prevailing reasons in the corporation's best interests that prevent the assertion of the claim for compensation.

43. These requirements exist in order to prevent abusive derivative actions by minority shareholders.

44. It does not appear from Olaf Gierke's declaration that HCS will be able to meet these requirements. In particular, the court's dismissal of the First Convocation Petition, the result of the special audit and the imminent likely dismissal of the Second Convocation Petition suggest that HCS will not be able to plead facts that would justify the suspicion that Innoplexus has suffered a damage due to the purported conduct of Partex and Dr. Gunjan Bhardwaj.

45. The Innoplexus Proceeding, thus, does not have a realistic prospect of being initiated because HCS will likely not be able to plead facts that are sufficient to meet the burden imposed by German corporate law in order to prevent abusive derivative actions by minority shareholders. In light of this, the Discovery Request would likely not serve any legitimate purpose, but would quite obviously constitute a fishing expedition aimed at obtaining evidence that would enable HCS to continue its obstructive conduct, and thereby increase its nuisance value.

    2. <u>The Partex Proceeding</u>

46. The same is true with respect to the Partex Proceeding, in which HCS purportedly intends to assert claims for alleged violations of Sections 20.1, 20.2 and 20.7 of the Shareholders' Agreement. Sections 20.2 and 20.7 of the Shareholders' Agreement provide for a

non-compete obligation of, *inter alia*, Partex. Section 20.1 of the Shareholders' Agreement requires Dr. Gunjan Bhardwaj to devote his entire business time to Innoplexus.

47. As Olaf Gierke's declaration concedes, claims based on an alleged breach of a non-compete obligation were part of the First Convocation Petition. This follows from the reference in para. 32 to section 113 para. 1 of the German Commercial Code (*Handelsgesetzbuch* – "HGB") which provides for damage claims in the event of a violation by a partner in an unlimited partnership of the statutory non-compete obligation. The court's decision of 3 August 2022, thus, confirms that HCS was unable to plead sufficiently specific facts to conclusively demonstrate that Partex breached a non-compete obligation. As regards Section 20.1 of the Shareholders' Agreement, HCS' claims are based on Dr. Gunjan Bhardwaj's activities as a member of the board of Partex. Partex and Dr. Gunjan Bhardwaj do not dispute that Dr. Gunjan Bhardwaj is (and was during most of his term as a member of Innoplexus' management board) a member of the Partex board. The parties' dispute is around the validity and interpretation of Section 20.1 of the Shareholders' Agreement. As this is a purely legal question, there does not appear to be a need for discovery with respect to HCS' purported claim under Section 20.1 of the Shareholder Agreement. It is, therefore, not surprising that none of the evidence sought by HCS with the Discovery Request appears to relate to a purported breach by Dr. Gunjan Bhardwaj of Section 20.1 of the Shareholders' Agreement.

I. <u>Document Production in German Proceedings</u>

48. I do not agree with the assertion in Olaf Gierke's declaration that "the requested discovery would almost certainly be unavailable to Petitioner in the German Proceedings" (para. 39.)

49. As Olaf Gierke's declaration acknowledges, it is possible for a party in German civil proceedings to petition the court for an order against the other party or against third parties to produce certain documents (pursuant to sec. 142 of the German Code of Civil Procedure (Zivilprozessordnung – "ZPO")). To obtain a document production order against a third party, the applicant must show that the documents can reasonably be expected to be in the third party's possession. It is not necessary for the third party to be involved in the proceedings (e.g. as a witness). Through international legal assistance, a German court's document production order could also be executed with respect to documents located abroad.

50. In order to prevent a party from abusing the court to conduct mere fishing expeditions, German case law requires that the applicant must specify the documents to be produced with a sufficient degree of specificity.

51. The German rules of civil procedure thus give the parties to civil proceedings pending before a German court tools to obtain documents from the other party or from third parties. Such requests have been successful in the past in individual cases, even in cases where large volumes of documents were requested.

J. <u>The German Court can call for Testimony from Ruben King-Shaw</u>

52. I understand Ruben King-Shaw has stated that he would be willing to testify in German proceedings if he was called to do so. The German courts have the power to call witnesses to testify where they believe it would be useful. A deposition of Ruben King-Shaw would not replace his testimony as a witness in German proceedings.

53. While it is permissible in German proceedings to submit the transcript of a deposition conducted in a U.S. discovery, such transcript would not be regarded as evidence of the veracity of the statements made by the person deposed.

54. Under the German rules of civil procedure, the transcript would be regarded as a means of documentary evidence, and it would only constitute proof of the fact that the person deposed made the statements recorded in the transcript. However, the transcript could not be regarded as proof that the recorded statements are indeed true, i.e. whether the events described by the person deposed occurred in the manner stated by the person deposed.

55. Accordingly, if statements made by Ruben King-Shaw in his deposition and introduced by HCS into the German Proceedings were contested and relevant to the determination of the German Proceedings, the German court would have to take evidence regarding the veracity of those statements by other means of evidence available to it.

56. The German Federal Court of Justice (Bundesgerichtshof – "BGH") has ruled that, as a matter of principle, a court may not refuse to hear a witness solely because a party has already submitted a written witness statement by that same witness that was recorded in another proceeding. The request to hear that person as a witness renders the witness statement inadmissible as evidence in lieu of the witness' own testimony. The Federal Court of Justice emphasized the following:

> "However, the use of the previous statements of the named witnesses by way of documentary evidence instead of their examination in the pending proceedings becomes inadmissible if a party requests the examination of this witness for the purpose of direct evidence […] Due to the obvious weaknesses of the use of witness statements as documentary evidence - lack of personal impression of the witnesses, lack of opportunity to ask questions and make representations, lack of opportunity for cross-examination - the law does not make this right dependent on a detailed explanation of the reasons." BGH, Judgment of 12 July 2013, V ZR 85/12 (juris, para. 8)

57. In this context it is important to note that Ruben King-Shaw would be able testify as a witness in the German Proceedings and has expressed his willingness to do so.

58. If a party to the German Proceedings called Ruben King-Shaw as a witness, the German court will most likely hear him as a witness. In that case, the court would not be

permitted to rely solely on the transcript of Ruben King-Shaw's deposition in a U.S. discovery as a means of evidence. Examination of Ruben King-Shaw as a witness in the German Proceedings would not require his presence in Germany, but could be conducted by way of a videoconference.

59. In accordance with the case law of the Federal Court of Justice, the court would be required to rely on Ruben King-Shaw's witness testimony (rather than only on the transcript of his deposition) when assessing the evidence before it. Against this background, the relevance of Ruben King-Shaw's deposition in a U.S. discovery for the German Proceedings would be considerably diminished.

K. <u>Confidentiality Obligations under German Stock Corporation Act</u>

60. In his declaration, Olaf Gierke concedes that members of the supervisory board of a German stock corporation, like Ruben King-Shaw, are subject to a strict duty of confidentiality (Sec. 116 para. 1, 93 para. 1, sentence 3 AktG). Violation of the duty of confidentiality is a criminal offence punishable by a prison term of up to one year or a fine (Sec. 404 AktG).

61. The duty of confidentiality is generally understood to be very broad so that it can fulfil its purpose – to ensure the free exchange of information and cooperation among members of the supervisory board and between the management board and the supervisory board in a spirit of mutual trust as well as the protection of the interests of the corporation. It pertains to all matters that are not generally known and with respect to which the corporation has an interest that they be kept secret, but also to such matters the disclosure of which may have a detrimental effect on the corporation, even if they are generally known and therefore not (any longer) secret.

62. The supervisory board member's duty of confidentiality not only covers information provided by the management board to the members of supervisory board, and

resolutions of the supervisory board, but all information which the supervisory board member receives in connection with his or her capacity as a member of the supervisory board, irrespective of whether such information is received during or outside of supervisory board meetings. Deliberations of the supervisory board and its committees are covered by the duty of confidentiality. This is generally considered to apply to all information exchanged during a meeting as well as to the conduct of the meeting and the statements and actions of the attendees irrespective of whether they constitute confidential information. Furthermore, it is universally acknowledged that information which a supervisory board member obtained prior to his or her appointment, but which is related to his or her supervisory board activities, may also be subject to the duty of confidentiality.

63.     It would, therefore, be necessary to verify with regard to each document requested from and each question asked of Ruben King-Shaw requested testimony – even those regarding information received before being appointed member of supervisory board – whether they are covered by the duty of confidentiality. Whether a document or information is subject to the obligation of confidentiality must be assessed objectively. The supervisory board member has no discretion in assessing this question and can, thus, not determine himself or herself with binding effect whether a document or piece of information is confidential (and whether he or she would be in breach of his obligations or even liable to prosecution if such information were disclosed). Only Innoplexus (or a special representative) could release Ruben King-Shaw from the duty of confidentiality. As Innoplexus is unlikely to grant such a release, it is to be expected that Ruben King-Shaw will comprehensively invoke the obligation of confidentiality and *will not be able* to make statements or hand over documents.

L. <u>The Usefulness of Reciprocal Discovery</u>

64. While Partex respectfully contends that allowing HCS to obtain disclosure from Ruben King-Shaw would not be proper here, in the event that such disclosure is allowed, I respectfully submit that it would be fair and appropriate to allow Partex the opportunity to obtain comparable disclosure by way of requiring production of documents from HCS, and a deposition of Mr. Semmler, regarding the subject matter of HCS' allegations against Partex and Dr. Gunjan Bhardwaj. As Olaf Gierke has noted, German procedure provides limited opportunities for pre-trial disclosure. It would thus give HCS an unfair advantage to allow it to obtain pre-hearing disclosure that will purportedly support its claims against Partex while not giving Partex the opportunity to obtain comparable disclosure of the basis (or lack thereof) for HCS' purported claims against Partex. Such disclosure would be useful to us in preparing for the defense of the claims HCS states that it intends to bring against Partex and Dr. Gunjan Bhardwaj.

*       *       *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 16, 2023

_____
Carsten van de Sande